T.C. Memo. 2016-194

UNITED STATES TAX COURT

W. MORGAN PARKER AND LINDA M. PARKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8793-14.                                   Filed October 25, 2016.

W. Morgan Parker and Linda M. Parker, pro sese.

<u>John D. Ellis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) deter-
mined a deficiency in petitioners' 2010 Federal income tax of $93,942 and an ac-
curacy-related penalty of $18,788.  Before trial respondent conceded the following
adjustments set forth in the notice of deficiency:  (1) a $44,950 adjustment to
income on account of a thrift savings plan distribution, which was actually a loan;

**[\*2]** (2) additional tax of $4,495 determined under section 72(t)[1] on the foregoing amount; and (3) a deduction of $34,280 for home mortgage interest. At trial petitioners conceded that they failed to report a $4,534 taxable refund of State income tax.

After further concessions at trial and in respondent's post-trial brief (discussed further below), the issues for decision are: (1) whether petitioners received unreported income from their two sole proprietorships; (2) whether petitioners are entitled to deduct certain expenses reported on their respective Schedules C, Profit or Loss From Business; and (3) whether petitioners are liable for an accuracy-related penalty. With certain exceptions, we will sustain respondent's determinations.

## FINDINGS OF FACT

During 2010 petitioner husband, Mr. Parker, operated as a sole proprietorship a collateral repossession business, Mid-Atlantic Auto Recovery (Mid-Atlantic). He contracted with banks and other financial institutions that had made loans based on collateral (typically cars, but occasionally appliances or equipment). If the borrower became delinquent on the loan, Mid-Atlantic would repossess the

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] collateral, hold it for at least 10 days,[2] and follow the bank's instructions regarding ultimate disposition of the property. The banks paid Mid-Atlantic fees for these services, and Mr. Parker deposited these fees into one of his bank accounts.

From January to September 2010 Mid-Atlantic operated out of a trailer on a leased security lot where the repossessed collateral was kept. This trailer had telephone, electricity, and Internet service provided by local utilities. Mr. Parker moved Mid-Atlantic's operations to another lot in September 2010. Mid-Atlantic had three full-time employees during 2010: Mr. Parker, his son, and his daughter. Other family members and their friends occasionally served as drivers or part-time office staff.

During 2010 petitioner wife, Mrs. Parker, briefly operated a Mary Kay business selling cosmetic products. She purchased $5,000 of startup inventory before 2010 and sold a small portion of this inventory during the first few months of that year. After deciding that she did not like the business, she discontinued it in mid-2010. She retained all of the unsold inventory.

---

[2]Mr. Parker testified that State law required creditors to hold repossessed collateral for at least 10 days before disposing of it.

**[*4]**  Petitioners maintained more than a dozen accounts at Wachovia Bank during 2010.  Four of these accounts were titled in Mid-Atlantic's name; Mr. Parker generally deposited fees received from the financial institutions into one of these accounts.  The other accounts were held in petitioners' names, either individually or jointly, and were used for both business and personal purposes.

For 2010 petitioners timely filed Form 1040, U.S. Individual Income Tax Return.  They included in this return a Schedule C for the Mid-Atlantic business that reported gross receipts of $101,714 and total expenses of $125,209, for a net loss of $23,495.  The reported expenses were as follows:

| Expense | Amount |
| --- | --- |
| Rent | $22,876 |
| Utilities | 13,862 |
| Insurance | 9,507 |
| Contract labor | 29,786 |
| Car and truck | 37,466 |
| Other | 11,712 |

Petitioners also included in this return a Schedule C for the Mary Kay business that reported gross receipts of $369, cost of goods sold of $4,626, and car and truck expenses of $20,000, for a net loss of $24,257.

The IRS selected petitioners' 2010 return for examination and, on January 15, 2014, issued them a timely notice of deficiency.  On the basis of a bank de-

**[\*5]** posits analysis, the IRS determined that petitioners had omitted $46,130 of gross receipts from the Mid-Atlantic business and $4,813 of gross receipts from the Mary Kay business. The IRS disallowed for lack of substantiation all of the deductions that petitioners claimed on the Schedules C. The IRS also determined an accuracy-related penalty with respect to these adjustments. While resident in Virginia, petitioners timely petitioned this Court for redetermination of the deficiency and the penalty.

At the close of trial the Court ordered one round of seriatim briefs. Respondent timely filed his brief on April 11, 2016; petitioners did not file a post-trial brief.[3] When a party fails to file a brief on issues that have been tried, we may consider those issues waived or conceded. See, e.g., Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Stringer v. Commissioner, 84 T.C. 693, 704-708 (1985), aff'd without published opinion, 789 F.2d 917 (4th Cir. 1986). We will exercise our discretion not to do so here.

---

[3]Petitioners submitted to the Court by facsimile on June 10, 2016, a document purporting to be a post-trial brief. The Court informed petitioners that a brief cannot be filed by facsimile but must be filed electronically or in paper form. Petitioners did not file a brief as instructed by the Court.

**[*6]** OPINION

## I. Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The U.S. Court of Appeals for the Fourth Circuit, the appellate venue in this case absent stipulation to the contrary, has held that the usual presumption of correctness applies in omitted income cases where the IRS employs a "reasonable method of determining income," such as the bank deposits method. Williams v. Commissioner, 999 F.2d 760, 763-764 (4th Cir. 1993), aff'g T.C. Memo. 1992-153. Other courts have required the IRS in unreported income cases to establish a "minimal evidentiary showing" connecting the taxpayer with the income-producing activity. E.g., Blohm v. Commissioner, 994 F.2d 1542, 1548-1549 (11th Cir. 1993), aff'g T.C. Memo. 1991-636.

If the IRS were required to make a "minimal evidentiary showing" here, respondent has met that burden by introducing bank records establishing that petitioners received unreported income from their sole proprietorships. Petitioners thus bear the burden of proving by a preponderance of the evidence that respondent's determination of unreported income is arbitrary or erroneous. See Williams, 999 F.2d at 763 (citing Helvering v. Taylor, 293 U.S. 507, 515 (1935));

[*7] <u>Tokarski v. Commissioner</u>, 87 T.C. 74 (1986). Petitioners do not contend, and they could not plausibly contend, that the burden of proof as to any issue of fact should shift to respondent under section 7491(a).

## II.    Unreported Income

Section 61(a) defines gross income as "all income from whatever source derived," including income derived from business. A taxpayer must maintain books and records establishing the amount of his or her gross income. <u>See</u> sec. 6001. When a taxpayer does not keep accurate books and records, the IRS may determine his or her income "under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b); <u>see</u> <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 693 (1989). And where the taxpayer has unexplained bank deposits, the IRS may employ the bank deposits method to estimate his or her income. <u>Estate of Hague v. Commissioner</u>, 132 F.2d 775 (2d Cir. 1943), <u>aff'g</u> 45 B.T.A. 104 (1941); <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 657 (1975), <u>aff'd</u>, 566 F.2d 2 (6th Cir. 1977). The IRS has great latitude in reconstructing a taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances." <u>Petzoldt</u>, 92 T.C. at 687.

Bank deposits are prima facie evidence of income. The bank deposits method starts with the presumption that all money deposited in a taxpayer's bank

**[\*8]** account during a given period constitutes taxable income. <u>Price v. United States</u>, 335 F.2d 671, 677 (5th Cir. 1964). This presumption is rebutted to the extent the deposits are shown to include nontaxable amounts, and "the Government must take into account any non-taxable source * * * of which it has knowledge." <u>Ibid.</u>; <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 868 (1991), <u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992).

After the IRS reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the IRS' implementation of the bank deposits analysis was unfair or inaccurate. See <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994); <u>DiLeo</u>, 96 T.C. at 871-872. The taxpayer may do so by showing (among other things) that certain deposits came from nontaxable sources. See <u>Clayton</u>, 102 T.C. at 645. Nontaxable sources include funds attributable to interaccount bank transfers and returned checks, as well as "loans, gifts, inheritances, or assets on hand at the beginning of the taxable period." <u>Burgo v. Commissioner</u>, 69 T.C. 729, 743 n.14 (1978) (quoting <u>Troncelliti v. Commissioner</u>, T.C. Memo. 1971-72).

The revenue agent (RA) employed the bank deposits method to reconstruct petitioners' income. After obtaining copies of petitioners' bank statements by issuing summonses to their banks, the RA used the statements (which are part of

[*9] the record) to prepare schedules listing all deposits. After eliminating nontaxable receipts of which he was aware, the RA prepared and provided to petitioners a schedule that determined unreported income of $50,943. Of this sum, the RA allocated $46,130 to the Mid-Atlantic business and $4,813 to the Mary Kay business. Petitioners did not respond to the RA's analysis, nor did they provide him with any documents establishing that certain deposits represented nontaxable receipts.

With respect to the Mary Kay business, the evidence at trial established, and respondent now concedes, that $2,853 of the deposits represented nontaxable reimbursement to Mrs. Parker from family and friends for a vacation trip. This leaves in question the remaining $1,960 of deposits. Petitioners offered no evidence that these deposits reflected nontaxable items. We accordingly find that petitioners received during 2010 unreported income of $1,960 from the Mary Kay business.

With respect to the Mid-Atlantic business, respondent concedes that petitioners received $3,420 of the deposited funds in 2009 and that this income was not taxable for 2010. This leaves in question the remaining $42,710 of deposits. Petitioners' primary argument is that some of these deposits were nontaxable advances of "bailout" money from Mid-Atlantic's financial institution clients. Mr.

[*10] Parker testified that a third party might have a prior claim on collateral that the client wished him to repossess; for example, a car might have been towed to a city lot because of unpaid parking tickets, or a piece of machinery might be subject to a mechanics lien. He testified that the financial institutions would advance him funds to cover such contingencies, enabling him to "bail out" the collateral and then repossess it. Because Mid-Atlantic allegedly held these funds in a fiduciary capacity, petitioners urge that the funds represented nontaxable receipts.

In an effort to quantify these alleged advances of "bailout" money, Mr. Parker provided a substitute Form 1099-MISC, Miscellaneous Income, issued to Mid-Atlantic by Ford Motor Credit for 2010. He also provided a summary, which he prepared, listing bank deposits allegedly corresponding to payments from Ford Motor Credit in 2010. The Form 1099-MISC reports $27,615 of income whereas Mr. Parker's summary shows $33,240 of deposits. Petitioners contend that the difference between these numbers, or $5,625, corresponds to nontaxable advances of "bailout" money.

For at least three reasons, we are unpersuaded by petitioners' argument. First, they failed to establish that all of the deposits on Mr. Parker's summary actually corresponded to payments from Ford Motor Credit. Second, petitioners claimed on their Schedule C for the Mid-Atlantic business, under the category of

**[*11]** "Other" expenses, a deduction of $1,886 for "bailouts paid." If it was Mr. Parker's practice to claim a deduction for bailouts paid, he would first have to include in gross income any advances of funds used for bailouts. Third, Mid-Atlantic had at least 12 bank clients during 2010, but petitioners produced no documentary evidence regarding supposed "bailout" advances from any client other than Ford Motor Credit.[4]

In sum, petitioners have failed to prove that they received advances of "bailout" money from Mid-Atlantic's clients during 2010 or that, if they received such advances, the advances constituted nontaxable receipts. And they offered no evidence suggesting that the bank deposits in question constituted nontaxable receipts for any other reason. We accordingly find that petitioners received during 2010 unreported income of $42,710 from the Mid-Atlantic business.

III.    Schedule C Expenses

Deductions are a matter of legislative grace. The taxpayer bears the burden of proving that reported business expenses were actually incurred and were "ordi-

---

[4]Mr. Parker testified that he had Forms 1099-MISC from other clients, but he failed to produce them to respondent before November 25, 2015, the date by which we ordered petitioners to produce to respondent any documents they wished to use at trial. In any event, Mr. Parker contradicted himself by first stating that he had (but did not produce) these additional Forms 1099-MISC and then stating that these documents had been either lost or destroyed in a storm.

[*12] nary and necessary." Sec. 162(a); Rule 142(a). The taxpayer also bears the burden of substantiating expenses underlying his claimed deductions by keeping and producing records sufficient to enable the IRS to determine the correct tax liability. Sec. 6001; INDOPCO v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), (e), Income Tax Regs. The failure to keep and present such records counts heavily against a taxpayer's attempted proof. Rogers v. Commissioner, T.C. Memo. 2014-141, at *17.

In the event a taxpayer establishes that he has incurred a deductible expense but is unable to substantiate the precise amount, the Court may approximate the amount of the deduction, bearing heavily against the taxpayer whose inexactitude is of his own making. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). The Court must, however, have evidence sufficient to provide a basis upon which an estimate can be made. Norgaard v. Commissioner, 939 F.2d 874, 879 (9th Cir. 1991), aff'g in part, rev'g in part T.C. Memo. 1989-390; Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Section 274(d) imposes stricter substantiation requirements for deductions claimed for expenses of travel, meals, and entertainment. No such deduction is allowed unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating his own statements, the amount, time and place, and

[*13] business purpose for each expenditure. Sec. 274(d); sec. 1.274-5T(a), (b), and (c), Temporary Income Tax Regs., 50 Fed. Reg. 46014-46017 (Nov. 6, 1985). A court may not apply the Cohan rule to approximate expenses covered by section 274(d). Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969).

### A. Mid-Atlantic Business

#### 1. Rent Expense

Petitioners reported on their Schedule C for the Mid-Atlantic business a rent expense of $22,876 for the lease of Mid-Atlantic's security lot. Respondent in his post-trial brief conceded the rent expense deduction in full. We accordingly conclude that petitioners are entitled to deduct a rent expense of $22,876 for 2010.

#### 2. Insurance Expense

Petitioners reported on their Schedule C for the Mid-Atlantic business an insurance expense of $9,507. Respondent in his post-trial brief conceded the insurance expense deduction in full. We accordingly conclude that petitioners are entitled to deduct an insurance expense of $9,507 for 2010.

#### 3. Utilities Expense

Petitioners reported on their Schedule C for the Mid-Atlantic business a utilities expense of $13,862. Respondent in his post-trial brief conceded a

[*14] deduction for $357 of these expenses, attributable to payments to American Disposal and Don's Johns. Mr. Parker testified that Mid-Atlantic during 2010 paid for electricity service from Northern Virginia Electric Cooperative (NOVEC), and for landline and Internet service from Verizon, all of which was supplied to the trailer on Mid-Atlantic's security lot. He testified that he also paid for cell phone service from Sprint for himself and his employees.

With regard to electricity service, Mr. Parker provided a canceled check for $298 made out to NOVEC in March 2010. He testified that this check was representative of his usual monthly bill. He testified that for the other months in 2010 he paid the electric bill using a debit card; he produced no business records, invoices, or bank statements showing other payments to NOVEC. With regard to landline and internet service, Mr. Parker provided a canceled check for $375 made out to Verizon in March 2010; he provided no other documentary evidence of payments to Verizon. With regard to cell phone service, he provided a canceled check for $248 made out to Sprint in March 2010; he provided no other documentary evidence of payments to Sprint.

We find that Mid-Atlantic maintained electricity, landline, and Internet service in the trailer on its security lot, and we will estimate its utilities expense using the Cohan rule. Because Mr. Parker stated that the lease on the security lot

[*15] was in place from January to September, we will allow him a deduction for nine months of expenses for these utilities.  Since he substantiated expenses of $673 ($298 + $375) for March 2010 and established that these charges were typical, we will allow petitioners to deduct $6,057 ($673 × 9 months) on this account.  We will not allow a deduction for any cell phone expenses because petitioners provided no evidence that the cell phones in question--held by Mr. Parker and his children--were used for business purposes.[5] Taking into account the $357 conceded by respondent, we will allow a deduction for utilities expense of $6,414 for 2010.

### 4.    Contract Labor Expenses

Petitioners reported on their Schedule C for the Mid-Atlantic business contract labor expenses of $29,786.  Mr. Parker testified that Mid-Atlantic employed his son and daughter full time and that he occasionally hired other family members and their friends as part-time workers to staff the trailer and drive vehicles.  At trial he produced canceled checks totaling $20,678 in an effort to

---

[5]Cell phones were not "listed property" under sec. 280F(d)(4) for 2010 and petitioners thus were not required to meet the strict substantiation requirements of sec. 274(d).  However, they must still show that the cell phones were used for business rather than personal purposes and provide some credible evidence as to the extent of business use.  Because they did not satisfy these requirements, we will disallow a deduction for all of the cell phone expenses.

[*16] substantiate the latter expenses. Checks totaling $4,846 were made out to five named payees; respondent has conceded $4,688 of this sum, corresponding to checks written during 2010.

The rest of the canceled checks were made out to "cash," typically in round-dollar amounts such as $500. Mr. Parker testified that his usual practice was to make out checks to "cash" and personally deposit them into his workers' bank accounts. But the evidence showed that the opposite often occurred: On 42 occasions, Mr. Parker wrote checks, typically in exact dollar amounts such as $147.73, directly to the five named workers. He did not explain this inconsistency.

Petitioners offered no evidence, such as a Form 1099-MISC, a check stub, or another document, to show that the amounts of checks made out to "cash" were paid to workers as compensation for services rendered. Many of these checks were apparently given to family members or their acquaintances. The memo lines on many of these checks have obscure notations such as "Jessie," "M&A," and "BLAM"; Mr. Parker did not explain these references or link them in any way to contract labor. And the round-dollar amounts of these checks are at odds with the notion that they represented payment of hourly wages. We will accordingly disallow a deduction for the $25,098 of contract labor expenses not conceded by respondent.

**[*17]**      5.      <u>Car and Truck Expenses</u>

Petitioners reported on their Schedule C for the Mid-Atlantic business car and truck expenses of $37,466. This deduction was based not on actual expenses but on a "mileage allowance" of 50 cents a mile, for 74,931 alleged business miles driven using two tow trucks. Petitioners did not maintain or produce at trial a mileage log, odometer readings, a trip sheet, an account book, or any form of documentation to substantiate the 74,931 miles claimed. They thus failed to satisfy the substantiation requirements for deducting the mileage allowance. See Rev. Proc. 2010-51, 2010-51 I.R.B. 883.

At trial petitioners abandoned any claim to a mileage allowance and claimed a deduction for actual car and truck expenses, such as the cost of new tires, oil changes, and general maintenance. But they produced no documents to substantiate these expenses, apart from a $45 check payable to "Virginia DMV," which they did not establish was business related. The only other canceled checks were $500 checks made out to "cash" that were drawn on a Mid-Atlantic account and apparently deposited into Mrs. Parker's account. These checks do not evidence the payment of car and truck expenses.

Petitioners clearly incurred some car and truck expenses during 2010 because Mid-Atlantic was in the towing business. But they produced no substantia-

[*18] tion for the mileage allowance reported on their return or for the actual car and truck expenses for which they claimed a deduction at trial. Even if tow-truck expenses were regarded as exempt from the strict substantiation requirements of section 274(d), petitioners' failure to supply any substantiation whatsoever means that we are not at liberty to estimate these expenses. In order to estimate expenses under the Cohan rule, we must have some evidence on the basis of which an estimate can be made. Vanicek, 85 T.C. at 742-743. As it is, we have no alternative but to deny for lack of substantiation a deduction for the $37,466 of car and truck expenses.

### 6. Other Expenses

Petitioners reported on their Schedule C for the Mid-Atlantic business "other expenses" of $11,712. These expenses were allegedly incurred for: (1) Quickbooks software; (2) bank service charges; (3) computer and internet expenses; (4) continuing education classes; (5) dues and subscription fees; (6) postage and delivery expenses; (7) "taxes on Tarring property;" and (8) "bailouts." In an effort to substantiate these expenses petitioners produced at trial a few canceled checks, but none of these checks had any logical relationship to the categories of expenses reported. (Several of the checks were made out to "cash"; one was made out to American Disposal, and respondent conceded the amount

[*19] deductible as a utilities expense; another was made out to a contract worker.) We conclude that petitioners have not carried their burden of substantiating any of the reported "other expenses."

### B. Mary Kay Business

#### 1. Car and Truck Expenses

Petitioners reported on their Schedule C for the Mary Kay business car and truck expenses of $20,000. At trial they conceded the deduction for these expenses in full. We accordingly conclude that petitioners are not entitled to deduct any car and truck expenses for the Mary Kay business.

#### 2. Cost of Goods Sold

Petitioners reported on their Schedule C for the Mary Kay business gross receipts of $369 and cost of goods sold of $4,626. We have determined that the actual gross receipts of the Mary Kay business were $2,329 ($369 + $1,960 of unreported income). Respondent concedes that petitioners are entitled to a corresponding cost of goods sold of $953.

"Cost of goods sold is the amount that the taxpayer expended to purchase or construct inventory sold during the year." Gaitan v. Commissioner, T.C. Memo. 2012-3, 103 T.C.M. (CCH) 1010, 1012. Mrs. Parker testified that she purchased $5,000 of inventory before 2010 and that most of this inventory remained unsold

[*20] when she quit the Mary Kay business in mid-2010.  Petitioners testified that they had "boxes and boxes of that stuff still at the house."  The inventory that remained on hand after 2010 was obviously not sold during that year.  We conclude that petitioners have not borne their burden of proving entitlement to an adjustment for cost of goods sold in excess of the amount that respondent conceded.

IV.    Penalties

The Code imposes a 20% penalty on the portion of any underpayment of tax attributable to "[n]egligence or disregard of rules and regulations" or "[a]ny substantial understatement of income tax."  Sec. 6662(a) and (b)(1) and (2).  Negligence includes "any failure to make a reasonable attempt to comply" with the internal revenue laws.  Sec. 6662(c).  An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  Under section 7491(c) respondent bears the burden of production with respect to the liability of an individual for any penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith with respect thereto.  The taxpayer bears the burden of proving reasonable cause and good faith.  Id. at

**[\*21]** 446-447. Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs.

Respondent has met his burden of production with respect to petitioners' negligence and disregard of rules and regulations. Petitioners failed to report $44,670 of income attributable to their Mid-Atlantic and Mary Kay businesses and claimed more than $100,000 of deductions for which they had no substantiation whatsoever. Petitioners have not demonstrated that these failures were due to reasonable cause. For both businesses, petitioners maintained virtually no books and records to track their income and expenses. The evidence they produced at trial, consisting mostly of canceled checks, often bore little relationship to the income and expenses reported on their return. They did not rely on any professional advice in taking these positions.

We find that the entirety of petitioners' underpayment for 2010 was attributable to negligence. In the event the Rule 155 computation indicates that petitioners' understatement of income tax for 2010 exceeds the greater of $5,000 or 10% of the amount required to be shown on their 2010 return, we conclude that the underpayment is alternatively attributable to a substantial understatement of income tax for which they have not shown reasonable cause.

**[\*22]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.