T.C. Summary Opinion 2017-35

UNITED STATES TAX COURT

MARY T. KAHMANN AND ERIC C. KAHMANN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17703-15S.                         Filed May 25, 2017.

Mary T. Kahmann and Eric C. Kahmann, pro se.

John Schmittdiel and Shannon M. Harmon, for respondent.

SUMMARY OPINION

LEYDEN, Special Trial Judge: This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1] Pursuant to section 7463(b), the decision to be entered is not

---

[1]All section references are to the Internal Revenue Code in effect for the
year at issue, and all Rule references are to the Tax Court Rules of Practice and

(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

In a notice of deficiency dated May 12, 2015, the Internal Revenue Service (IRS)[2] determined a deficiency in petitioners' 2011 Federal income tax of $13,566, a section 6651(a)(1) addition to tax of $1,356.60 for failure to timely file a tax return, and a section 6662(a) accuracy-related penalty of $2,713.20. After concessions by petitioners,[3] the issues for decision are whether petitioners: (1) had unreported gross receipts for their business and (2) are liable for a section 6662(a) accuracy-related penalty.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners resided in Minnesota at the time they timely filed their petition.

---

[1](...continued)
Procedure, unless otherwise indicated.

[2]The Court uses the term "IRS" to refer to administrative actions taken outside of these proceedings. The Court uses the term "respondent" to refer to the Commissioner of Internal Revenue, who is the head of the IRS and is respondent in this case, and to refer to actions taken in connection with this case.

[3]At trial Mr. Kahmann conceded that petitioners' 2011 tax return was filed late and the addition to tax for late filing under sec. 6651(a)(1). Mrs. Kahmann did not appear in Court, but the decision will be binding upon both spouses.

I.    Petitioners' Jewelry Business

Petitioners have been making jewelry for 45 years.  In 2011 petitioners sold

their jewelry through their business, Harpstone Jewelry (Harpstone), primarily at

art shows held throughout the United States.[4]  Petitioners also made some internet

sales through Amazon and PayPal.  Mr. Kahmann's two brothers made and sold

their own jewelry and participated in their own art shows during 2011, but they

did not work for Harpstone in 2011.

Petitioners used two machines in 2011 linked to two merchant accounts[5]

that they maintained to accept credit and debit card payments from Harpstone

customers.  The merchant account company processed these payments and

deposited the payments received less a discount into petitioners' bank accounts.

The merchant account company issued two Forms 1099-K, Merchant

[4]On the Schedule C, Profit or Loss From Business, attached to their joint 2011 tax return only Mr. Kahmann is listed as the proprietor of Harpstone. However, the parties stipulated that petitioners both operated Harpstone.  On the basis of the record, the Court accepts the parties' stipulation.  Cf. Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) ("We may disregard stipulations between parties where justice requires it if the evidence contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record.").

[5]A merchant account is an arrangement whereby a bank agrees to collect credit and debit card payments and pays the merchant the sale amounts less a discount.  See Barnett Banks of Fla., Inc., & Subs. v. Commissioner, 106 T.C. 103, 105-106 (1996).

Card and Third Party Network Payments,[6] of $136,090.32 and $15,744.74.  Both

Forms 1099-K were issued in petitioners' names and business and showed

petitioners' merchant account numbers and the same mailing address petitioners

reported on their 2011 tax return.

Harpstone received most of its gross receipts between July and December

each year but paid most of its expenses between January and March each year.

Petitioners' expenses included show fees, cost of goods sold, and materials.

II.    Examination of Petitioners' 2011 Tax Return

Petitioners prepared their joint Federal individual income tax return for

2011 and filed it late.  See supra note 3.  On the Schedule C attached to their 2011

tax return petitioners reported the following for Harpstone:  (1) total gross receipts

---

[6]In the Housing and Economic Recovery Act of 2008 (HERA), Pub. L. No. 110-289, sec. 3091(a), 122 Stat. at 2908, Congress enacted sec. 6050W to require a payment settlement entity to issue an information return to participating payees reporting "the gross amount of the reportable payment transactions".  A payment settlement entity includes a merchant-acquiring entity, such as a merchant account services company.  See sec. 6050W(b)(2).  The new provision became effective for calendar years beginning after December 31, 2010.  HERA sec. 3091(e)(1), 122 Stat. at 2911.  Merchant account services companies were required to report the gross amount of payments without any reduction for discounts on a Form 1099-K after December 31, 2010.  See sec. 6050W(a)(2), (f)(2); sec. 1.6050W-1(a)(1)(ii), (6), (h)(1) and (2), (j), Income Tax Regs.

or sales of $128,070;[7] (2) cost of goods sold of $60,935; and (3) gross profit and gross income of $67,135. Petitioners also reported total expenses of $56,142, including $3,820 for "visa fees". Petitioners reported a net profit of $10,993 from Harpstone on the Schedule C. The net profit was the only gross income reported on their 2011 tax return.

The IRS examined petitioners' 2011 tax return. The revenue agent assigned to examine petitioners' tax return sent a letter to petitioners to request certain documents, including copies of their bank account statements, but petitioners did not provide the documents. After the deadline for submitting the requested documents, the revenue agent issued summonses to banks at which petitioners maintained at least three bank accounts. The summonses were issued to obtain petitioners' bank account statements so the revenue agent could conduct a bank deposits analysis.

---

[7]In 2011 the IRS added to Schedule C lines 1a, Merchant card and third party payments, and 1b, Gross receipts or sales not entered on line 1a, to implement the new reporting requirements under sec. 6050W(a). 2011 Instructions to Schedule C, at C-1; see supra note 6. On line 1a of the 2011 Schedule C petitioners reported zero. For 2011 taxpayers were not required to separately report amounts from Forms 1099-K on line 1a because "for 2011, the IRS ha[d] deferred the requirement to report these amounts." 2011 Instructions to Schedule C, at C-1. Instead, taxpayers were instructed to report the amounts from Forms 1099-K on line 1b. Id.

From the bank statements the revenue agent identified the following deposits to petitioners' three bank accounts for 2011: (1) $375.15 from Amazon; (2) $134,318.27 from bank card deposits; (3) $4,864.77 from checks made payable to Harpstone; (4) $24,875 from cash deposits; and (5) $5,169.85 from ATM deposits. The revenue agent was not convinced petitioners had informed her of all their bank accounts. Therefore, to determine Harpstone's total gross receipts the revenue agent substituted the aggregate amounts reported on the two Forms 1099-K, $151,835, for the bank card deposits she had identified. The revenue agent determined that the Forms 1099-K were more reliable because they were issued in petitioners' names and business, had the same mailing address petitioners' included on their 2011 tax return, and represented amounts deposited into bank accounts the merchant account payor had associated with petitioners' names.

The revenue agent could not reconcile the amount of $15,745 reported on one of the Forms 1099-K with the bank statements she had summoned because at the time of the examination she did not have the merchant account statements showing the bank account into which the payments were deposited. Respondent later obtained the merchant account statements, and the parties stipulated them for trial.

The revenue agent calculated that Harpstone's total gross receipts were $188,073 for 2011. She also concluded that petitioners had unreported gross receipts for Harpstone of $60,003, the difference between the gross receipts petitioners reported on the Schedule C, $128,070, and the gross receipts the revenue agent calculated using a bank deposits analysis and the two Forms 1099-K.

## Discussion

### I. Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In unreported income cases some courts have required the IRS to establish a "minimal evidentiary showing" connecting the taxpayer with the income-producing activity. Blohm v. Commissioner, 994 F.2d 1542, 1548-1549 (11th Cir. 1993), aff'g T.C. Memo. 1991-636; see Page v. Commissioner, 58 F.3d 1342, 1347 (8th Cir. 1995), aff'g T.C. Memo. 1993-398; Day v. Commissioner, 975 F.2d 534, 537 (8th Cir. 1992), aff'g in part, rev'g in part T.C. Memo. 1991-140. Respondent has met that burden by introducing bank account records, Forms 1099-K, and merchant account statements establishing that petitioners received unreported income from their jewelry business in 2011.

Thus petitioners bear the burden of proving by a preponderance of the evidence that respondent's determination of unreported income is arbitrary or erroneous. See Page v. Commissioner, 58 F.3d at 1347; Williams v. Commissioner, 999 F.2d 760, 763 (4th Cir. 1993) (citing Helvering v. Taylor, 293 U.S. 507, 515 (1935)), aff'g T.C. Memo. 1992-153; Day v. Commissioner, 975 F.2d at 537; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Parker v. Commissioner, T.C. Memo. 2016-194, at *6.

II.     Unreported Income

Section 61(a)(2) defines gross income as "all income from whatever source derived", including income derived from business. A taxpayer has a duty to maintain adequate records to show whether or not he or she is liable for Federal income tax. Sec. 6001.

The parties stipulated Exhibit 9-J, "copies of 2011 merchant account statements related to the merchant account number ending in *7220". This 45-page exhibit consists of statements from January through December 2011 for one of the merchant accounts that petitioners used during 2011. The last three pages of that stipulated exhibit include a three-page handwritten accounting (first handwritten accounting) that petitioners prepared, listing the sales they made through Harpstone.

Generally, a stipulation of fact is treated as a conclusive admission by the parties and is binding on the parties. Rule 91(e); <u>Stamos v. Commissioner</u>, 87 T.C. 1451, 1455 (1986). However, the Court is not bound by a stipulation of fact that appears contrary to the facts disclosed by the record. Rule 91(e); <u>Jasionowski v. Commissioner</u>, 66 T.C. 312, 318 (1976). The amounts listed on the merchant account statements as credit card sales for each month are much less than the amounts listed by petitioners on the first handwritten accounting. Because the first handwritten accounting is contrary to the facts in the record, including the stipulated merchant account statements, and for reasons discussed below, the Court sets aside the first handwritten accounting.

At trial petitioners introduced a second version of the three-page handwritten accounting[8] (second handwritten accounting) that they supposedly created in 2011 allegedly listing all the sales they had made through Harpstone. The Court does not find either the first or the second handwritten accounting of Harpstone's sales for 2011 to be accurate or reliable.

---

[8]The second handwritten accounting is identical to the first handwritten accounting except that the second handwritten accounting contains an additional fifth column supposedly listing mileage. At trial respondent did not object to admitting the second handwritten accounting into evidence.

The first and second handwritten accountings are titled "2011 Shows" and purport to list all the 2011 art shows petitioners attended at which they sold their jewelry. Each page of the first and second handwritten accountings has four columns. The first four columns do not have any headings and contain the following information: (1) the first has dates in a month-and-day format; (2) the second has cities and States; (3) the third has figures next to the dates that supposedly represent the sales made on the corresponding dates; and (4) the fourth has the supposed sums of the sales made during the total period in the listed city and State. All figures are in whole dollars. The second handwritten accounting has a fifth column titled "miles" and has figures allegedly representing the total miles petitioners supposedly drove to and from each listed city and State.

The last page of each of the first and second handwritten accountings has an untitled line with a $127,101 figure, supposedly representing the total sales from the art shows during 2011. Below that is a line titled "Internet Sales" with a $971 figure. Below that is another untitled line with a $128,072 figure, supposedly representing the total gross receipts from all sales for 2011. Mr. Kahmann, however, did not show how the amounts listed on the first or second handwritten accounting corresponded to the deposits to petitioners' bank accounts or to the amounts listed on the merchant account statements.

Although Mr. Kahmann testified that he wrote the entries in the first handwritten accounting as the art shows were attended, the Court finds that the handwriting appears as if the entries were written all at once rather than over the course of the year. All the entries on the second handwritten accounting, except for the mileage entries, appear to have been written in the same handwriting with the same shade of ink. If the entries were made over the course of a year the Court would expect to see variations in handwriting and ink shades. Similarly, the mileage entries in the fifth column also appear to have been written all at once but in a lighter shade of ink than the entries in the other four columns. These mileage entries were added after the first handwritten accounting was attached to the stipulation of facts.

The internet sales of $971 were payments received through petitioners' PayPal account for 2011. However, petitioners had additional internet sales totaling $375.15 from Amazon for 2011 which they did not record on either the first or second handwritten accounting.

As best we can determine from the record, other than the first and second handwritten accountings petitioners did not kept any formal books of account or other accounting records to track Harpstone's gross receipts for 2011. The Court concludes that petitioners did not keep accurate, regular, and contemporaneous

business records for Harpstone during 2011. Because petitioners' records did not adequately demonstrate the amount of business income they received in 2011, it was appropriate for respondent to use an indirect method to reconstruct their business income for 2011. See Giddio v. Commissioner, 54 T.C. 1530, 1532-1533 (1970); Sabolic v. Commissioner, T.C. Memo. 2015-32, at *9-*10.

When a taxpayer does not keep accurate books and records, the IRS may determine his or her income "under such method as, in the opinion of the * * * [IRS], does clearly reflect income." Sec. 446(b); see Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). Where the taxpayer has unexplained bank deposits, the IRS may employ a bank deposits analysis to estimate his or her income. Estate of Mason v. Commissioner, 64 T.C. 651, 657 (1975), aff'd, 566 F.2d 2 (6th Cir. 1977). The IRS has great latitude in reconstructing the taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances." Petzoldt v. Commissioner, 92 T.C. at 687; see Caulfield v. Commissioner, 33 F.3d 991, 993 (8th Cir. 1994), aff'g T.C. Memo. 1993-423; Rowell v. Commissioner, 884 F.2d 1085, 1087 (8th Cir. 1989), aff'g T.C. Memo. 1988-410.

Bank deposits are prima facie evidence of income. Clayton v. Commissioner, 102 T.C. 632, 645 (1994). A bank deposits analysis presumes that

all money deposited in a taxpayer's bank account during a given period constitutes taxable income. Id. at 645-646. "[T]he * * * [IRS] must take into account any non-taxable source * * * of which it has knowledge." DiLeo v. Commissioner, 96 T.C. 858, 868 (1991) (citing Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964)), aff'd, 959 F.2d 16 (2d Cir. 1992). Once the IRS reconstructs the taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the IRS' implementation of a bank deposits analysis was unfair or inaccurate. See Clayton v. Commissioner, 102 T.C. at 645; DiLeo v. Commissioner, 96 T.C. at 871. The taxpayer may do so by proving that a deposit is not taxable. See Clayton v. Commissioner, 102 T.C. at 645. Nontaxable sources include funds attributable to interaccount bank transfers and returned checks, as well as "loans, gifts, inheritances, or assets on hand at the beginning of the taxable period." Burgo v. Commissioner, 69 T.C. 729, 743 n.14 (1978) (quoting Troncelliti v. Commissioner, T.C. Memo. 1971-72).

Petitioners do not challenge the revenue agent's use of the bank deposits analysis to reconstruct their business income for 2011. Instead, petitioners argue that the inclusion of certain income for 2011 is inaccurate because it is not taxable business income to petitioners. At trial Mr. Kahmann provided uncorroborated testimony to challenge the following amounts resulting from the revenue agent's

bank deposits analysis: (1) $24,857 in cash deposits, (2) $4,865 in check deposits, and (3) some of the amounts reported on the Forms 1099-K.

The Court declines to accept Mr. Kahmann's uncorroborated testimony. See, e.g., Tokarski v. Commissioner, 87 T.C. at 77. For the reasons discussed below, the Court concludes that petitioners had unreported Schedule C gross receipts of $60,003 for 2011.

A.    Cash Deposits

Mr. Kahmann argues that the unreported cash deposits of $24,857 are not business income to petitioners for 2011 because they were from a cash hoard petitioners kept. According to Mr. Kahmann, when petitioners needed to pay expenses they supposedly took money from an alleged cash hoard, deposited it into their bank accounts, and paid the expenses through the bank accounts. The existence of a cash hoard is endlessly claimed to explain the existence of unreported income, rarely successful, and often met with some suspicion. See DeVenney v. Commissioner, 85 T.C. 927, 933 (1985). The Court is suspicious of Mr. Kahmann's claim and finds he did not prove that petitioners maintained a cash hoard to account for the cash deposits in 2011.

Petitioners failed to introduce any credible evidence showing that they maintained a cash hoard or that any of the cash deposits identified by the revenue

agent's bank deposits analysis were from cash accumulated in a prior year. Petitioners also failed to provide any credible evidence to support their claims that the cash hoard consisted of nontaxable gifts or an inheritance from Mrs. Kahmann's aunt and mother, as petitioners claimed.

Mr. Kahmann provided conflicting and uncorroborated testimony at trial to explain petitioners' cash hoard argument. First, Mr. Kahmann argued that the cash hoard was petitioners' cash on hand at the start of the year because most of their sales occurred during the last six months of the year (July to December) and all their expenses were paid from January to March. He testified that Harpstone had to accumulate reserves of about $30,000 during the last six months to pay expenses at the beginning of each year and that petitioners deposited the cash on hand into the bank as needed. Mr. Kahmann testified that he did not deposit cash from Harpstone's sales in 2011 into the bank accounts in 2011 and that all the cash deposits into petitioners' bank accounts were solely from the cash hoard. Petitioners did not maintain regular books and records to prove Mr. Kahmann's assertions, and Mr. Kahmann did not present any other credible evidence to support his testimony.

Mr. Kahmann pointed to the first and second handwritten accountings to show that the cash deposits made before the first show on January 28, 2011, could

not have been income from Harpstone but, rather, were cash deposits made from the cash hoard. However, the cash deposits made in 2011 before January 28, 2011, total only $3,200, not the $24,857 of cash deposits that the revenue agent identified from the cash deposits analysis as unreported income.

Second, Mr. Kahmann argued that the cash hoard included gifts from Mrs. Kahmann's aunt. Mr. Kahmann testified that he and Mrs. Kahmann "were blessed to be born into a very wealthy family" and that Mrs. Kahmann's aunt had given petitioners over $1 million since 1978. Specifically, Mr. Kahmann testified that Mrs. Kahmann had received shares of stock from her aunt[9] and that petitioners had a debit card they could use to withdraw money from the stock account. However, Mr. Kahmann testified that petitioners had not withdrawn money from that stock account during 2011. Petitioners did not present any evidence to support Mr. Kahmann's assertions that the cash hoard consisted of gifts from Mrs. Kahmann's aunt.

Third, Mr. Kahmann argued that petitioners had a considerable amount of money in late 2010 because Mrs. Kahmann had received an inheritance from her

---

[9]At trial Mr. Kahmann offered as an exhibit a statement from an investment adviser purporting to show the value of an investment that Mrs. Kahmann had inherited from her aunt. Respondent objected to the exhibit as hearsay, and the Court ruled that the exhibit was not admissible.

mother, which was added to the cash hoard. Mr. Kahmann testified that in late 2010 Mrs. Kahmann inherited from her mother $30,000 in cash, 27 gold coins, 100 ounces of silver, and $18,000 from the sale of Mrs. Kahmann's mother's home and its contents. Mr. Kahmann did not provide any other evidence to corroborate his testimony. The revenue agent testified that she did not notice any large deposits in the bank accounts she examined that would support Mr. Kahmann's assertion that his wife had inherited $30,000 in cash.

Mr. Kahmann also testified that in 2011 he had sold some of the gold coins Mrs. Kahmann had inherited from her mother and that he had put the proceeds into the cash hoard in 2011. Mr. Kahmann admitted that he had not reported the gain from the sale of the gold coins on petitioners' 2011 tax return. When asked whether petitioners had deposited any of these proceeds into their bank accounts, Mr. Kahmann testified that petitioners probably had not.

The Court finds petitioners' assertions to be unsupported and rejects their claims that the source of the unreported cash deposits for 2011 was a cash hoard.

B.    Check Deposits

Petitioners also argue that an unidentified portion of the $4,865 in check deposits, the sum of the checks made payable to Harpstone as determined by the bank deposits analysis, belonged to one of Mr. Kahmann's brothers. Mr.

Kahmann testified that his brother would give him checks also made out to "Harpstone", and Mr. Kahmann would deposit them into petitioners' bank accounts and would withdraw cash from the bank accounts to give to his brother. Mr. Kahmann testified that his brother had also used the name Harpstone Jewelry for his own separate business but did not provide any other proof to support his assertion. Mr. Kahmann testified that his brother did not have a website, a business card, or other information showing that he also had a business called Harpstone Jewelry.

Petitioners failed to introduce any credible evidence to prove that any of the checks deposited into their bank accounts included checks for the business of Mr. Kahmann's brother. The Court finds petitioners' assertions to be unsupported and rejects their claim that a portion of the check deposits consisted of checks for a separate business operated by Mr. Kahmann's brother.

C.    Amounts on the Two Forms 1099-K

Petitioners argue that some or all of the reported amounts on the two Forms 1099-K are income attributable to Mr. Kahmann's brothers. Petitioners argue that $28,444 of the $136,090.32 reported on one of the Forms 1099-K is income attributable to one of Mr. Kahmann's brothers and that all the $15,744.74 reported on the second Form 1099-K is income attributable to his other brother.

In any Court proceeding where a taxpayer asserts a reasonable dispute with respect to income reported on a third-party information return, if the taxpayer fully cooperates with the IRS then "the secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return." Sec. 6201(d). Full cooperation requires informing the IRS of the dispute within a reasonable time. H.R. Rept. No. 104-506, at 36 (1996), 1996-3 C.B. 49, 84. In addition the taxpayer must provide timely "access to and inspection of all witnesses, information, and documents within the control of the taxpayer as reasonably requested by the Secretary". Sec. 6201(d).

Section 6201(d) does not apply in this case because petitioners failed to fully cooperate with the IRS. The revenue agent requested certain documents from petitioners, including copies of their bank account statements. Petitioners did not provide the documents to the revenue agent, and, as a result, she had to issue summonses to petitioners' banks to obtain the bank account statements for 2011. At trial Mr. Kahmann attempted to introduce letters written by his brothers to corroborate his testimony. His brothers were not available to be called as witnesses, and the Court ruled that the letters were inadmissible hearsay. Mr. Kahmann agreed that petitioners did not bring Mr. Kahmann's brothers to meet

with either the revenue agent during the examination or with respondent's counsel in preparation for trial.

Petitioners bear the burden of proving that respondent's determination to include the amounts reported on the Forms 1099-K is arbitrary or erroneous. See Page v. Commissioner, 58 F.3d at 1347; Day v. Commissioner, 975 F.2d at 537; United States v. Gunnink, No. 12-1528, 2015 U.S. Dist. LEXIS 30560, at *12-*13 (D. Minn. Jan. 23, 2015) (holding that data obtained from third-party information returns to reconstruct income was reasonable when the taxpayer did not maintain regular business records). Mr. Kahmann's testimony was vague and uncorroborated. Petitioners have not convinced the Court that respondent's determination to include the amounts reported on the Forms 1099-K is arbitrary or erroneous or that some or all the amounts are attributable to Mr. Kahmann's brothers.

Mr. Kahmann testified that his brothers commingled their credit card transactions with petitioners' transactions in 2011 by using petitioners' two merchant account machines. He also testified that he had given one of his brothers an ATM card for petitioners' bank account and that his brother was free to withdraw from the bank account in order to obtain the merchant account payment deposits. Mr. Kahmann also testified that he kept 5% of what his brother

deposited as part of the arrangement. Although Mr. Kahmann testified that he still had the ATM card he had given to his brother, he failed to provide it to the revenue agent during the examination or to produce it at trial. Morever, Mr. Kahmann contended that the $15,744 reported on one of the Forms 1099-K was directly deposited into his brother's bank account. However, petitioners provided no corroborating evidence to support this claim. Petitioners have not persuaded the Court that it should disregard the amounts listed on the Forms 1099-K as unreported gross receipts.

Petitioners have not produced any credible evidence to dispute their receipt of the cash deposits, check deposits, and amounts reported on the Forms 1099-K for 2011. Accordingly, the Court sustains respondent's determination that petitioners had unreported Schedule C gross receipts of $60,003 for 2011.

III.    Section 6662(a) Accuracy-Related Penalty

Respondent determined an accuracy-related penalty for 2011 because petitioners' underpayment was due to a substantial understatement of income tax or negligence or careless disregard of rules or regulations. Sec. 6662(a) and (b)(1) and (2). Respondent's contentions necessarily reflect alternative grounds for imposing the section 6662 accuracy-related penalty because only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of an

underpayment, even if that portion is attributable to more than one type of conduct listed in section 6662(b). See New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 187 (2009), aff'd, 408 F. App'x 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). To meet that burden the Commissioner must produce sufficient evidence to show that it is appropriate to impose the accuracy-related penalty. See id. As explained below the Court concludes that respondent has met his burden of production with respect to a substantial understatement of income tax under section 6662(a) and (b)(2) or, in the alternative, with respect to negligence or disregard of rules or regulations under section 6662(a) and (b)(1), for 2011.

Once the Commissioner meets his burden of production, a taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Rule 142(a); see Higbee v. Commissioner, 116 T.C. at 447. The taxpayer may meet this burden by proving that he or she acted with reasonable cause and in good faith with respect to the underpayment. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 447; sec. 1.6664-4(b)(1), Income Tax Regs. As explained below petitioners did not provide persuasive evidence that they acted

with reasonable cause and in good faith with respect to the underpayment of tax for 2011.

### A. Substantial Understatement

The Court has sustained the item in the notice of deficiency that was not conceded--the unreported gross receipts for Harpstone.[10] The result is a substantial understatement of income tax for 2011. An "understatement" means the excess of the amount of the tax required to be shown on the tax return over the amount of tax that is shown on the tax return, reduced by any rebate. Sec. 6662(d)(2)(A). There is a substantial understatement of income tax for any taxable year if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A).

Petitioners' 2011 tax return showed a tax of $1,350. Respondent determined the amount of tax required to have been shown on petitioners' 2011 tax return was $14,916. Thus, the understatement of tax determined by respondent was $13,566. That amount exceeds $5,000, which is greater than $1,491.60, 10% of the tax required to be shown on petitioners' 2011 tax return. Therefore,

---

[10]Petitioners conceded that they were liable for the addition to tax under sec. 6651(a)(1) for filing their 2011 tax return late. See supra note 3.

petitioners have substantially understated their income tax and are liable for the accuracy-related penalty under section 6662(a) and (b)(2) for 2011.

B.      Negligence or Disregard of Rules or Regulations

The accuracy-related penalty may also be imposed under section 6662(a) because of negligence or disregard of rules or regulations. Sec. 6662(b)(1). In the alternative petitioners are liable for the accuracy-related penalty because they were negligent and acted in careless disregard of rules or regulations.

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); see Higbee v. Commissioner, 116 T.C. at 448; sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); see Higbee v. Commissioner, 116 T.C. at 448.

Respondent has met his burden of production with respect to petitioners' negligence and careless disregard of rules or regulations because petitioners failed to maintain adequate records demonstrating their gross receipts for Harpstone for

2011. Mr. Kahmann testified that petitioners' returns for four prior years had been audited by the IRS for their underreporting of income. Nevertheless, petitioners failed to maintain adequate books and records documenting Harpstone's gross receipts for 2011.

Accordingly, the Court concludes that, in the alternative, petitioners were negligent and acted in careless disregard of rules or regulations and are liable for the accuracy-related penalty under section 6662(a) and (b)(1) for 2011.

C.     Reasonable Cause for the Underpayment of Tax

A penalty will not be imposed under section 6662(a), however, if a taxpayer establishes that he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1). Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional or an honest misunderstanding of the law that is reasonable in the light of all the facts and circumstances. Sec. 1.6664-4(b), Income Tax Regs.; see Higbee v. Commissioner, 116 T.C. at 449. Relevant facts and circumstances for the Court to consider include the knowledge and experience of the taxpayer. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners did not hire a tax professional or seek advice from a tax professional to prepare their 2011 tax return. Petitioners, who bear the burden of persuasion, have not come forward with any evidence that they had an honest

misunderstanding of the law in the light of all the facts and circumstances. Petitioners' only assertion as to why the accuracy-related penalty should not be sustained is that their 2011 tax return was accurate as filed. When petitioners filed their tax return they had access to the bank statements and merchant account statements the IRS relied upon to determine their tax liability. Petitioners' course of action does not reflect a good-faith effort to calculate their proper tax liability.

The Court concludes that petitioners are liable for the section 6662(a) accuracy-related penalty for 2011.

In reaching its conclusions, the Court has considered all arguments made by the parties and, to the extent not mentioned above, the Court concludes they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.