# United States Tax Court

T.C. Memo. 2026-18

JACK GOODWILL-OIKERHE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 20144-19.                    Filed February 11, 2026.

————

Jack Goodwill-Oikerhe, pro se.

*Victoria E. Cvek*, *David A. Indek*, *Archana Ravindranath*, *Amanda K. Bartmann*, and *Nancy M. Gilmore*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*: Petitioner is a highly educated individual who wholly owns an S corporation, Golden Express International, Inc. (GEI), through which he engages in tax return preparation and other services. Respondent issued petitioner a Notice of Deficiency (NOD) in which he determined that petitioner is liable for federal income tax deficiencies of $6,704, $24,067, and $11,223 and section 6663[1] fraud penalties of $5,028, $18,050, and $8,417 for taxable years 2015, 2016, and 2017 (years in issue), respectively. Petitioner timely filed the Petition in this case. The issues for decision are whether petitioner is (1) entitled to dependency exemption deductions for each of the years in issue; (2) entitled to a property tax deduction for 2016; (3) entitled to

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

**[\*2]** unreimbursed employee expense deductions for vehicle and cell phone expenses for 2015 and 2016; (4) entitled to various deductions with respect to GEI for each of the years in issue; and (5) liable for the fraud penalty for each of the years in issue. For the reasons set forth below, we sustain respondent's determinations in full.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts and the accompanying Exhibits are incorporated herein by this reference. Petitioner resided in Maryland when he filed the Petition.

I.  *Petitioner's Background*

A.  *Residence*

During the years in issue petitioner resided on Antanna Avenue in Baltimore, Maryland. The Antanna Avenue residence consisted of three stories. During the years in issue petitioner used the top two stories as living quarters and used the basement exclusively as GEI's office. The Antanna Avenue residence was owned by petitioner's brother, Austin Oparanma, who resided in Nigeria. Petitioner had a verbal agreement with his brother to use the residence.

B.  *Family*

Petitioner has two nephews, Chisa and Chinda Oparanma, through his brother Mr. Oparanma. The nephews were born in 1997 and 1998. During the years in issue Chisa and Chinda attended school in Ukraine, with Mr. Oparanma paying at least some of their school fees.

C.  *Education*

In 1985, petitioner earned a bachelor's degree in business administration from Central State University. In 2006, petitioner earned a master's degree in accounting and finance from Morgan State University. At the time of trial petitioner was a Ph.D. candidate in public policy and administration at Walden University, a program which

---

[2] In the alternative to the section 6663 fraud penalties, respondent determined that petitioner is liable for section 6662(a) accuracy-related penalties attributable to negligence, or a substantial understatement of income tax, for each of the years in issue. Because we sustain the fraud penalties, we do not address these penalties. Other adjustments made in the NOD are computational and also will not be discussed.

[*3] he began in 2016. As part of his course loads for both his bachelor's and master's degrees, petitioner took courses in accounting and taxation. Petitioner's accounting courses covered basic accounting principles including cash basis versus accrual method accounting.

D.    *Work Experience*

1.    *Tax Return Preparation*

In 1984, petitioner began preparing U.S. income tax returns for himself, his family, and friends for no compensation. In 2006, after completing his master's degree, petitioner began preparing tax returns commercially through GEI, which we discuss in more detail *infra* Findings of Fact Part II. In 2010, petitioner was issued a preparer tax identification number. As of the time of trial, petitioner still had a number and continued to prepare tax returns for others.

2.    *Other Work*

During the years in issue petitioner was employed by a car dealership, Bob Davidson Ford (BDF), as a lot attendant in its service department. As a lot attendant, petitioner was required to take customer cars to and from a service lot and occasionally to shuttle customers to or from their homes. Petitioner would also assist with the general maintenance of the service department, such as by cleaning floors. Petitioner would work intermittently for BDF throughout each year, taking time off to do other things such as his tax preparation work. When petitioner did work for BDF, he worked approximately 40 hours per week.

BDF discouraged employees from incurring personal expenses to complete work-related tasks, including advising against the use of personal vehicles. BDF provided an employee handbook, or blue book, that reflected this policy to every employee when they first started with BDF. If a vehicle was needed to complete a work-related task, BDF would provide a shuttle vehicle. Or, if a shuttle vehicle was not available, BDF would put a dealer tag on another car if it was for a short distance. The general radius allowed by BDF for shuttle pickup and dropoff of a customer was seven to ten miles.

If a BDF employee was required to pick up a part or other item for BDF, a shuttle vehicle would also be provided or the BDF parts department would provide a truck. There was never a time when a BDF employee would need to use a personal vehicle for a work-related task,

[*4] nor did BDF employees need personal cell phones to do work-related tasks.

One of the managers petitioner reported to at BDF was Anthony Moskunas. Another of petitioner's supervisors was John Marshall. Mr. Moskunas had no knowledge of petitioner's ever requesting to use a personal vehicle to complete a work task. And it was Mr. Marshall's understanding that BDF would never allow petitioner to drive his personal vehicle for company business.

For taxable years 2015, 2016, and 2017, petitioner received income reported on Forms W–2, Wage and Tax Statement, from BDF of $4,260, $9,230, and $7,054, respectively.[3] For taxable year 2015, petitioner also received income reported on Form W–2 from Anytime Labor Baltimore, LLC (Anytime Labor), of $83.

II.    *GEI*

A.    *In General*

During the years in issue petitioner was the sole shareholder of GEI, a subchapter S corporation that he organized in 2006. In addition to his other work, petitioner engaged in two separate business activities through GEI. One, as stated, was tax return preparation. The other was consolidation and shipping.

GEI obtained customers through referrals. GEI received payments for services primarily in cash although it also accepted checks. GEI also paid its expenses primarily in cash, and the parties stipulated that it used the cash basis method of accounting. GEI used the same bank accounts for both the tax return preparation and the consolidation and shipping activities. GEI did not deposit all its gross receipts into its bank accounts and paid few expenses from its bank accounts. GEI did not issue any Forms W–2 to petitioner for the years in issue. Nor did it issue any Forms 1099–MISC, Miscellaneous Income, for the years in issue.

---

[3] The parties stipulated that petitioner received income reported on Forms W–2 from BDF of $4,529 for 2015 and $7,053 for 2017. The Forms W–2 included in the record, however, report these amounts as $4,260 and $7,054, respectively, and these are the amounts petitioner included in his federal income tax returns. *See infra* Findings of Fact Part III.B. Neither party has sought any adjustment with respect to petitioner's BDF wages, and they are not in dispute.

[*5]   GEI had two computers that it used for its business. Petitioner's cousin, Sanni Momoh, assisted petitioner with the maintenance of GEI's books and records for the years in issue. Mr. Momoh maintained GEI's books and records in Excel-type spreadsheets.

### B.   *Tax Return Preparation*

Petitioner, through GEI, prepared over 100 returns for taxable year 2015 and over 300 returns for each of taxable years 2016 and 2017. Petitioner used tax preparation software to prepare the returns and filed them electronically. Petitioner generally charged customers $200 for preparing and filing their federal and state tax returns and $50 for any additional state tax returns. Petitioner also provided certain discounts, however, such as for family, friends, and seniors.

### C.   *Consolidation and Shipping*

GEI's consolidation and shipping activity consisted both of consolidating various size items into freight containers and shipping them via cargo ships and of transporting vehicles in freight containers also via cargo ships. GEI charged customers for its consolidation and shipping expenses, any other corresponding business expenses, the price of the item if GEI purchased it (e.g., if it purchased a vehicle), and a profit margin. For the shipment of a vehicle, GEI generally charged approximately $1,200.

GEI used ports in New Jersey, Boston, Baltimore, and Miami, and shipped items primarily to Africa and the Caribbean. GEI would contract with shipping partners who it would have ship the consolidated freight containers and vehicles from the U.S. ports to their destinations. GEI sometimes paid day laborers in the United States to help load containers before shipment. GEI also sometimes paid day laborers at the shipment's destination to get the items to their recipients. GEI never directly purchased fuel for shipping.

GEI also sometimes worked with George Apusa, who was in Boston. Mr. Apusa had a business separate from but similar to GEI's consolidation and shipping activity. Mr. Apusa informed petitioner about expenses that he ostensibly incurred for GEI, such as payments to dockworkers and fuel expenses. Mr. Apusa did not break such expenses down by line item, however. For example, he would not tell petitioner how much he ostensibly paid each dockworker, but only the total amount it allegedly cost to do a job.

**[\*6]**     GEI did not pay Mr. Apusa directly for any such expenses. Nor did it pay Mr. Apusa any wages or other direct compensation. Instead, petitioner and Mr. Apusa had an arrangement whereby they would do work for each other and then give the other credit for the same amount. The expense numbers Mr. Apusa provided to petitioner with respect to issues he handled for GEI were the numbers petitioner had entered into GEI's books and records. Petitioner also used these numbers in preparing GEI's tax returns for the years in issue, which we discuss in more detail *infra* Findings of Fact Part III.A. Petitioner never requested any underlying documents, such as receipts or invoices, to support the numbers Mr. Apusa provided.

III.    *Tax Returns*

Petitioner prepared and timely filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for GEI for each of the taxable years 2015, 2016, and 2017. Petitioner also prepared and timely filed Forms 1040, U.S. Individual Income Tax Return, for himself for each of the taxable years in issue.

A.     *GEI's Returns*

On GEI's returns for each of the years in issue, petitioner reported that GEI used the cash method of accounting. In preparing GEI's returns, petitioner looked at income and expense numbers given to him by Mr. Momoh, but he did not review any underlying records or spreadsheets maintained by Mr. Momoh. As stated, neither did petitioner request any supporting documents from Mr. Apusa. GEI, through petitioner, reported its income and expenses, in pertinent part, as follows.

1.     *Gross Receipts*

GEI reported its gross receipts as $115,875, $124,692, and $82,746 for 2015, 2016, and 2017, respectively.

2.     *Fuel Tax Credits*

GEI claimed fuel tax credits of $15,480, $17,268, and $12,582 for 2015, 2016, and 2017, respectively. With respect to the credits, each return also reported the prior year's claimed fuel tax credit as other income. These amounts were $14,176, $15,480, and $17,268 for 2015, 2016, and 2017, respectively.

[*7]        3.      *Expenses*

On its returns for the years in issue, GEI also claimed deductions for various reported expenses including the following.

|  | *2015* | *2016* | *2017* |
|---|---|---|---|
| Bad Debts | $2,482 | $3,863 | $5,172 |
| Rents | 9,000 | 9,000 | 9,000 |
| Freights & Purchases | 79,856 | 82,176 | 48,931 |
| Travel & Entertainment | — | 6,734 | 7,426 |
| Nonemployee Compensation | 14,250 | — | — |
| Commissions | — | — | 7,520 |

4.      *Ordinary Business Income*

Subtracting its deductions from its total reported income (i.e., gross receipts plus other income), GEI reported its ordinary business income as $11,312, $20,338, and $4,841 for 2015, 2016, and 2017, respectively. GEI issued to petitioner Schedules K–1, Shareholder's Share of Income, Deductions, Credits, etc., for each of the years in issue on which it reported these amounts as petitioner's 100% share of income from GEI.

B.      *Petitioner's Returns*

As with GEI, petitioner used the cash basis method of accounting on his individual returns. On his returns for 2015 and 2016, petitioner reported zero taxable income and claimed refunds of $5,292 and $5,882, respectively. And on his 2017 return petitioner reported $3,073 of taxable income and claimed a $4,514 refund. Petitioner further reported his income and expenses, in pertinent part, as follows.

1.      *Wage, Schedule C, and Other Income*

Petitioner reported his GEI Schedule K–1 income as gross receipts on Schedule C, Profit or Loss From Business, for taxable year

[*8] 2015 and as other income for taxable years 2016 and 2017.[4] Petitioner did not report any income on Schedule E, Supplemental Income and Loss, for the years in issue.

### 2. *Dependency Exemption Deductions*

Petitioner claimed dependency exemption deductions with respect to his two nephews for each of the years in issue.

### 3. *Property Tax Deduction*

For taxable year 2016, petitioner claimed an itemized deduction for personal property taxes of $4,630.

### 4. *Unreimbursed Employee Expense Deductions*

For taxable years 2015 and 2016, petitioner claimed itemized deductions with respect to unreimbursed employee expenses of $9,505 and $8,188, respectively. On his corresponding Form 2106, Employee Business Expenses, for 2015, petitioner included in his unreimbursed employee expense amount $8,221 of vehicle expenses and $1,284 of cell phone expenses. With respect to the vehicle expenses, petitioner reported that he drove 14,298 business miles, that his vehicle was used 98.39% for business, and that he had no other vehicle available for personal use. On his 2016 Form 2106, petitioner included in his unreimbursed expense amount $5,068 of vehicle expenses and $3,120 of cell phone expenses. As to these vehicle expenses, petitioner reported that he drove 9,386 business miles, that his vehicle was used 98.159% for business, and that he again had no other vehicle available for personal use.

## IV.   *Examination*

Internal Revenue Service (IRS) Revenue Agent Kevin Cascante (RA Cascante) examined petitioner's 2015, 2016, and 2017 tax returns. In conjunction with this examination RA Cascante also examined GEI's 2015, 2016, and 2017 tax returns. RA Cascante was assigned to petitioner's case in early 2018 by his then manager, Ashley Gunn. When RA Cascante became a revenue agent, he received training on how to

---

[4] For 2017, petitioner reported total other income of $17,423. The parties stipulated that this amount included the $4,841 of income reported on petitioner's 2017 Schedule K–1. We note that the remaining amount, $12,582, is the same amount as the fuel tax credit GEI claimed for 2017.

[*9] perform examinations. As of the time of trial, RA Cascante had been a revenue agent for 13 years and performed at least 100 income tax examinations, including examinations for both individuals and businesses.

### A. *Meetings and Documents, in General*

RA Cascante met with petitioner four times during the examination, twice in February 2018, once in June 2018, and once in July 2018. Each of these meetings took place at the Antanna Avenue residence. During these meetings RA Cascante asked petitioner to provide documents in support of his return positions. Petitioner provided RA Cascante only a few documents in response to this request.

RA Cascante had certain procedures he would follow depending on whether the document petitioner provided was an original or a copy. For original documents RA Cascante would memorialize the contents of the document in the case file and hand the document back to petitioner. Every receipt petitioner handed to RA Cascante, RA Cascante handed back to petitioner on the same day. For copies RA Cascante might take the document back to his office and make it a part of the case file. Specifically, RA Cascante took some copies of petitioner's invoices for GEI's tax preparation clients back to his office, "scheduled them out," and then mailed them back to petitioner. These copies were the only records that RA Cascante took with him from petitioner's residence. RA Cascante never kept any original documents that petitioner gave him. RA Cascante followed these same procedures in every other case to which he was assigned and in which a taxpayer gave him documents.

Petitioner told RA Cascante that he had documents to support his case in addition to the few that he had given him, but he did not provide RA Cascante with these additional documents. Neither did he provide RA Cascante with bank records, and RA Cascante had to summon the records. RA Cascante asked petitioner to reconstruct his records from the bank statements, but petitioner was unable to do so.

Petitioner did show RA Cascante a drawer or two that contained documents but told RA Cascante that he was unprepared to go through those documents and never provided them to RA Cascante. Petitioner also told RA Cascante that he would bring Mr. Momoh to a meeting with him to discuss GEI's records but he never did, nor did he provide RA Cascante with any spreadsheets prepared by Mr. Momoh. Petitioner further explained to RA Cascante that he could not provide more

**[\*10]** documents during the examination because there had been a flood at the Antanna Avenue property in early 2017 that destroyed his records.

To support his explanation of a flood, petitioner showed RA Cascante work proposals from a plumber for drain cleaning and replacement of a sewer line. The proposals were not signed by either petitioner or the plumber, and petitioner acknowledged to RA Cascante that the work was never completed. Petitioner did not provide RA Cascante with any other evidence that there was a flood or that a flood was the reason he was unable to provide more documents. Petitioner did not take any photographs of the alleged flood damage or file an insurance claim for flood damage. During RA Cascante's meetings with petitioner at his residence, RA Cascante did not see any evidence of a flood, even when he walked through the property's basement with petitioner during his first visit. Petitioner did not collect any information from Mr. Apusa to help reconstruct his records. Similarly, petitioner did not contact the shipping companies.

B.    *Specific Deductions*

During the examination, RA Cascante discussed with petitioner the deductions petitioner claimed on his individual returns. RA Cascante also discussed with petitioner the deductions he claimed on GEI's returns, which flowed through to petitioner's individual returns. *See* § 1366(a).

1.    *Petitioner's Deductions*

a.    *Dependency Exemption Deductions*

As to the dependency exemption deductions petitioner claimed with respect to his two nephews, petitioner told RA Cascante that Chisa and Chinda stayed with him for visits. But petitioner was unable to tell RA Cascante when their visits were or how long the visits lasted. Nor did petitioner show RA Cascante any evidence of the nephews' living with him at the Antanna Avenue residence when RA Cascante met with him there. Petitioner likewise did not tell RA Cascante what expenses he paid with respect to his nephews. The only evidence petitioner did provide to RA Cascante ostensibly with respect to providing their support was two or three Western Union-type receipts totaling approximately $1,100.

**[\*11]**          b.      *Property Tax Deduction*

Petitioner informed RA Cascante that he claimed the $4,630 personal property tax deduction on his 2016 return because he paid property taxes on the Antanna Avenue residence. In support of the deduction, petitioner showed RA Cascante a water bill, a property tax bill, and a $3,468 receipt dated in 2017 from the City of Baltimore. Petitioner asserted to RA Cascante that the City of Baltimore receipt covered property taxes with respect to at least part of 2016 such that the date on which he paid the taxes did not matter.

         c.      *Unreimbursed Employee Expense Deductions*

With respect to the vehicle and cell phone expenses for which he claimed unreimbursed employee expense deductions for 2015 and 2016, petitioner told RA Cascante that the expenses were incurred primarily for his work at BDF and that he would use his personal vehicle to pick up parts and vehicles and to shuttle customers. RA Cascante asked petitioner for documentation to support these expenses, but petitioner did not provide any, nor was he able to explain to RA Cascante how he calculated his expenses.

RA Cascante attempted to verify petitioner's statements regarding the use of his personal vehicle at BDF. During one of his meetings with petitioner, RA Cascante and petitioner had a phone call with petitioner's supervisor Mr. Marshall. Mr. Marshall stated his understanding that BDF would never allow petitioner to drive his personal vehicle for company business. After the call, petitioner told RA Cascante that Mr. Marshall was not aware of an agreement petitioner had with a higher level of management at BDF authorizing him to use his personal vehicle. But when RA Cascante asked petitioner if he would be willing to drive to BDF to clear up the issue, petitioner declined. Nor did petitioner explain the business necessity of the cell phone use to RA Cascante or provide him with any supporting documentation with respect to the phone.

         2.      *GEI's Flowthrough Deductions*

         a.      *Bad Debts*

Petitioner did not provide RA Cascante with any documents to support GEI's bad debt deductions for the years in issue. Petitioner told RA Cascante that there were generally two scenarios in which he would claim bad debt deductions: (1) if someone wrote petitioner a bad check,

[*12] he would deduct it as bad debt expense when it happened; and (2) if he purchased a vehicle for transport overseas and upon receipt and inspection of the vehicle the customer negotiated a lower payment amount than that originally agreed upon. RA Cascante explained to petitioner that because GEI used the cash basis method of accounting, GEI would not be entitled to a bad debt deduction in petitioner's sample situations because the initial amount of income would not have been reported in gross receipts. In response to RA Cascante's explanation, petitioner declared he did not know what RA Cascante was talking about.

### b. *Rents*

As to GEI's rent deductions for the years in issue, petitioner informed RA Cascante that the deductions reflected rent he paid to his brother Mr. Oparanma for GEI's use of the Antanna Avenue residence's basement. Petitioner further informed RA Cascante that his rental agreement with his brother was a verbal one and that he was paying $750 per month. But petitioner provided RA Cascante with no evidence of the agreement or any rent payments to Mr. Oparanma. RA Cascante did, however, view the 2017 City of Baltimore receipt as proof that petitioner had made a payment in lieu of rent for that year. Consequently, RA Cascante allowed one-third of the amount of the receipt, or $1,156, as a rent expense for 2017. RA Cascante arrived at the one-third amount by counting the basement as constituting one-third of the residence.

### c. *Freights and Purchases*

In discussing GEI's freight and purchase expenses, petitioner provided RA Cascante with a buyer's order for a Jaguar that was purchased for $78,037 in 2015 as well as documents showing that a Mack truck and a car were shipped from Boston to Nigeria for $2,930 in 2017. RA Cascante allowed the documented expenses. Petitioner did not provide any additional substantiation or explanation for the reported freight and purchase expenses above the amounts allowed by RA Cascante.

### d. *Travel and Entertainment*

Petitioner did not provide RA Cascante with any information regarding GEI's reported travel and entertainment expenses for 2016 and 2017.

**[\*13]**                    e.        *Nonemployee Compensation*

Petitioner had no records to support the nonemployee compensation expense GEI deducted for 2015, and he could not provide any to RA Cascante during the examination. Petitioner was also unable to reconstruct the amount reported as nonemployee compensation. Petitioner explained to Mr. Cascante that GEI was not required to issue Forms 1099 with respect to the nonemployee compensation because no individual worker was paid over $600. Petitioner could not name any of the workers paid, however, and he did not know whether the same person had worked for him multiple times.

f.        *Commissions*

Petitioner provided RA Cascante with no records to support the commission expense GEI deducted for 2017. Petitioner told RA Cascante that the purpose of the commission expense was to pay a transfer agent in Nigeria.

C.        *Examination Results*

RA Cascante's examination resulted in adjustments with respect to both petitioner's and GEI's returns for each of the years in issue. RA Cascante also determined that section 6663 fraud penalties should be imposed with respect to petitioner.

V.        *Notices of Deficiency*

On August 14, 2019, respondent issued petitioner the NOD for taxable years 2015, 2016, and 2017 in which he determined that petitioner is liable for the deficiencies and section 6663 fraud penalties at issue. On December 3, 2019, respondent issued GEI an NOD in which he determined GEI was also liable for deficiencies for taxable years 2015, 2016, and 2017.

A.        *GEI's NOD*

In GEI's NOD, the only adjustment respondent made was to disallow the fuel tax credits that GEI claimed for the years in issue. Respondent issued a separate NOD to GEI for the fuel tax credit adjustments because they were entity-level adjustments that did not flow through to petitioner's individual income tax returns. *See* § 1366(a), (f)(1). Respondent reflected the remaining adjustments that resulted from the examination of GEI's returns on petitioner's NOD as

**[\*14]** flowthrough adjustments. No petition was filed with respect to GEI's NOD.

    B.    *Petitioner's NOD*

    1.    *The Deficiencies*

Respondent determined the deficiencies in petitioner's NOD on the basis of multiple adjustments. Respondent disallowed the dependency exemption deductions that petitioner claimed with respect to his two nephews for each of the years in issue. Respondent also disallowed the itemized deductions that petitioner claimed with respect to unreimbursed employee expenses for 2015 and 2016 and with respect to personal property tax for 2016. In addition, respondent determined that petitioner had Schedule E income of $38,863, $106,631, $61,536 for 2015, 2016, and 2017, respectively.

The Schedule E income amounts were based on respondent's recharacterization of the GEI Schedule K–1 income that petitioner had reported as Schedule C gross receipts for 2015 and as other income for 2016 and 2017.[5] They were also based on the aforementioned flowthrough adjustments with respect to GEI. More specifically, the Schedule E income amounts reflected the following modifications with respect to GEI's claimed deductions.

|  | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|
|  | *Claimed* | *Allowed* | *Claimed* | *Allowed* | *Claimed* | *Allowed* |
| Bad Debts | $2,482 | –0– | $3,863 | –0– | $5,172 | –0– |
| Rents | 9,000 | –0– | 9,000 | –0– | 9,000 | $1,156 |
| Freights & Purchases | 79,856 | $78,037 | 82,176 | –0– | 48,931 | 2,930 |
| Travel & Entertainment | — | — | 6,734 | –0– | 7,426 | –0– |
| Nonemployee Compensation | 14,250 | –0– | — | — | — | — |
| Commissions | — | — | — | — | 7,520 | –0– |

---

[5] For 2017, respondent recharacterized only the $4,841 amount reflected on the 2017 Schedule K–1. Respondent removed the remaining $12,582 petitioner reported as other income.

**[\*15]** They also reflected respondent's removal of the other income that GEI reported with respect to the disallowed fuel tax credits.

2. *The Section 6663 Fraud Penalties and Their Approval*

Respondent also determined in petitioner's NOD that section 6663 fraud penalties should apply because all or part of the underpayment for each taxable year in issue was due to fraud. Respondent first notified petitioner of the determination to impose the fraud penalties in a Letter 950, or 30-day letter, that respondent issued to petitioner on April 26, 2019. The 30-day letter included a copy of RA Cascante's examination report and a summary of the adjustments made to petitioner's returns for 2015, 2016, and 2017. The 30-day letter was signed by Ms. Gunn as "Group Manager."

When Ms. Gunn signed the 30-day letter, RA Cascante had accepted a new position within the IRS with a new supervisor, Joanna Caree. Ms. Caree was not assigned to petitioner's case, however, and Ms. Gunn remained the supervisor responsible for the case. For the duration of RA Cascante's work on the examination, which continued after he accepted his new position, RA Cascante reported to Ms. Gunn with respect to petitioner's case and he discussed the imposition of the section 6663 fraud penalty with her. Neither Ms. Caree nor any other manager supervised RA Cascante's work on the case.

On the same date that Ms. Gunn signed the 30-day letter, she also signed a Civil Penalty Approval Form. RA Cascante prepared the form as part of his examination of petitioner's returns. The form identifies its "primary" position as "IRC 6663 Fraudulent Failure to File, Civil," and an attachment to the form bears checks in a "yes" box next to "6651(f) Fraudulent Failure to File" and in a "no" box next to "6663 Civil fraud." It was RA Cascante's intention in preparing the form to assert section 6663 fraud penalties and the references to the section 6651(f) fraudulent failure to file penalty were made by mistake. The parties have stipulated that the Civil Penalty Approval Form approved the assertion of section 6663 penalties for taxable years 2015, 2016, and 2017.

OPINION

Petitioner contends that he is entitled to the disputed deductions. He also contends that no penalties should apply. In support of these contentions, petitioner generally asserts that he supplied documentation to support his expenses to the best of his ability and that

**[\*16]** he was unable to produce more documents both because his records were destroyed in a flood and because RA Cascante took his records and did not return them.[6]

I.     *The Disputed Deductions*

  A.     *Burden of Proof*

The Commissioner's determinations in an NOD to disallow deductions are generally presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are matters of legislative grace, and the taxpayer must show his entitlement to any deductions claimed and substantiate their amounts.[7] § 6001; Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976). There must be enough evidence in the record to permit the Court to conclude that a deductible expense was paid in at least the amount allowed. *See Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957). A taxpayer's "self-serving declaration is generally not a sufficient substitute for records." *Fine v. Commissioner*, T.C. Memo. 2013-248, at \*4. And in evaluating a taxpayer's evidence, we are not bound to accept unverified and undocumented testimony. *Shea v. Commissioner*, 112 T.C. 183, 189 (1999); *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

When a taxpayer claims a deduction but cannot fully substantiate the underlying expense, the Court in certain circumstances may approximate the allowable amount, "bearing heavily . . . upon the taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). But the Court is not required to guess at a number; rather "we must have some basis on which an estimate may be made." *Vanicek v. Commissioner*, 85 T.C. 731,

---

[6] As we understand it, petitioner further asserts that respondent miscalculated GEI's gross receipts attributable to tax return preparation by insufficiently accounting for fee discounts. We note, however, that respondent did not reflect any adjustments to GEI's gross receipts in petitioner's NOD.

[7] Section 7491(a) provides that the burden of proof may shift to the Commissioner on a factual issue if, among other requirements, the taxpayer "introduces credible evidence with respect to [that] issue" and "has maintained all records required under this title and has cooperated with reasonable requests by the [Commissioner] for witnesses, information, documents, meetings, and interviews." *See* § 7491(a)(1), (2)(B). Petitioner does not contend, and the record does not demonstrate, that he meets these requirements.

**[\*17]** 743 (1985). In addition, under section 274(d), certain categories of deductions, including deductions with respect to certain vehicle, travel, and entertainment expenses, are subject to strict substantiation requirements. *See* §§ 274(d), 280F(d)(4). Section 274(d) provides that no deduction shall be allowed for these expenses unless the taxpayer substantiates the amount, time and place, business purpose, and business relationship to the taxpayer of the person receiving the benefit for each expenditure by adequate records or sufficient evidence corroborating his own statements. The Court may not apply the *Cohan* rule to approximate expenses covered by section 274(d). *See Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969).

### B.    *Petitioner's Records*

Before we consider the specific deductions at issue, we first address petitioner's general assertions that he had records supporting the disputed deductions that were destroyed in a flood and that were taken by RA Cascante and not returned.

As to the alleged flood, petitioner explained to RA Cascante during his examination that there had been a flood at the Antanna Avenue residence in early 2017 that destroyed his records. To support this explanation, petitioner showed RA Cascante work proposals from a plumber for drain cleaning and replacing a sewer line. But the proposals were not signed by either petitioner or the plumber, and petitioner acknowledged to RA Cascante that the work was never completed.

Petitioner did not provide RA Cascante with any other evidence that there was a flood or that a flood was the reason he was unable to provide more documents during the examination. Petitioner did not take any photographs of the alleged flood damage or file an insurance claim for flood damage. And during RA Cascante's meetings with petitioner at his residence, RA Cascante did not see any evidence of a flood, even when he walked through the property's basement with petitioner. In addition, petitioner provided RA Cascante with only very few documents for the years in issue, i.e., although the flood allegedly occurred in early 2017, petitioner did not provide RA Cascante with notably more documents for the remainder of taxable year 2017 than he did for taxable years 2015 and 2016.

At trial, petitioner further asserted that his records had been the casualty of a basement flood. And here he provided no supporting

**[\*18]** evidence at all. Petitioner testified that the flood caused significant damage to the basement, including to GEI's computers, but he offered no documents to support such damage or asserted repairs. He testified he did not know whether he or Mr. Momoh had backed up the computer files. And he did not make any effort to reconstruct his records, admittedly not collecting any supporting information from Mr. Apusa or the shipping companies after the alleged flood occurred. As we have stated, we are not bound to accept a taxpayer's self-serving, unverified, and undocumented testimony, and we see petitioner's assertion that he had records destroyed in a flood as nothing more.

Petitioner's assertion that RA Cascante took his documents and failed to return them is similarly unavailing. We have found RA Cascante had certain procedures he would follow depending on whether the document petitioner provided was an original or a copy. For original documents, RA Cascante would memorialize the contents of the document in the case file and hand the document back to petitioner. Every receipt petitioner handed to RA Cascante, he handed back to petitioner on the same day. For copies, RA Cascante might take the document back to his office and make it a part of the case file. Specifically, RA Cascante took some copies of petitioner's invoices for GEI's tax preparation clients back to his office, "scheduled them out," and then mailed them back to petitioner. But these copies were the only records that RA Cascante took with him from petitioner's residence, and he never kept any original documents that petitioner gave him.

As of the time of trial, RA Cascante had been a revenue agent for 13 years and performed at least 100 income tax examinations. He followed these same procedures in every case to which he was assigned and in which a taxpayer gave him documents. And as with the alleged flood, we likewise do not accept petitioner's baseless assertion that, in his case, RA Cascante kept his records and that this is the reason petitioner cannot provide more support for the disputed deductions.

C. *Petitioner's Deductions*

1. *Dependency Exemption Deductions*

Petitioner claimed dependency exemption deductions with respect to his nephews Chisa and Chinda for each of the years in issue. Section 151(c) permits a taxpayer to claim as a deduction an exemption for each dependent as that term is defined under section 152.

**[*19]** Section 152(a) provides that a dependent must be either a qualifying child or a qualifying relative.

Section 152(c)(1) defines a qualifying child as a child who bears a specified relationship to the taxpayer, who lived with the taxpayer for more than one-half of the taxable year at issue, who meets certain age requirements, who did not provide more than one-half of his or her own support during the taxable year, and who did not file a joint return with a spouse for the taxable year. As relevant here, a child satisfies the specified relationship requirement if the child is a descendant of the taxpayer's sibling. § 152(c)(2)(B). A child satisfies the age requirement if the child is less than 19 years old, a student less than 24 years old, or permanently and totally disabled. § 152(c)(3).

Section 152(d) defines a qualifying relative as an individual who bears a specified relationship to the taxpayer, who earned gross income of less than the exemption amount defined in section 151(d) during the taxable year, who had more than one-half of his or her support provided for by the taxpayer during the taxable year, and who is not the qualifying child of any other taxpayer. As relevant here, an individual satisfies the specified relationship requirement if the individual is a son or daughter of the taxpayer's sibling. § 152(d)(2)(E).

Respondent concedes that Chisa and Chinda each satisfied the relationship, age, support, and non-filing requirements for a qualifying child. Respondent also concedes that they each satisfied the relationship, gross income, and nonqualifying child requirements for a qualifying relative. He contends, however, that petitioner has failed to show that his nephews lived with him for more than one-half of each of the years in issue or that he provided over one-half of his nephews' support for each of the years in issue, as is required for qualifying children and qualifying dependents, respectively. We agree with respondent on both counts.

During the examination petitioner told RA Cascante that his nephews stayed with him for visits but was unable to say when his nephews' visits were or how long the visits lasted. Nor did petitioner show RA Cascante any evidence of the nephews' living with him at the Antanna Avenue property when RA Cascante met with him there. At trial, however, petitioner testified that his nephews lived with him "for a very long time," staying with him during winter breaks from approximately December to February and summer breaks from approximately May to August during the years in issue. But as with RA

**[\*20]** Cascante, petitioner offered the Court no documentary or other evidence, such as testimony from Chisa or Chinda, in support of his testimony.

Nor did petitioner tell RA Cascante what expenses he paid with respect to his nephews. The only evidence petitioner offered to RA Cascante with respect to providing their support was two or three Western Union-type receipts totaling approximately $1,100. Petitioner testified these receipts were for school fees, but he did not know the name of the school. Petitioner also testified that he paid for his nephews' flights to and from Ukraine, but he failed to offer documentary evidence in support of these, or any other, payments with respect to his nephews. In addition, petitioner did not know specifically how much he paid with respect to his nephews during the years in issue, and he admitted that his brother provided at least some of their support.

Petitioner contends that he has "done things in the family ways for my nephews who are my dependents and not counting monetary contributions to their livelihoods but purely on the family bonds that existed in us" and that "[w]hen there is call for needs or actions for incidental expenses, I do not count the pennies and dimes for doing the things for my nephews." Even if we assume, however, that petitioner's nephews stayed with him during at least some portion of their school breaks and that petitioner paid at least some of their expenses, we find it implausible based on petitioner's inconsistent and unsubstantiated explanations that they lived with him for more than one-half of any of the years in issue[8] or that he provided more than half of their support for any of those years. Consequently, petitioner is not entitled to the dependency exemptions he claimed with respect to his nephews for the years in issue.[9]

---

[8] We acknowledge that a taxpayer and child may be considered to occupy the same household for an entire taxable year notwithstanding temporary absences by the child due to special circumstances, such as education. *See* Treas. Reg. § 1.152-1(b). Considering petitioner's failure to provide any credible evidence showing where the nephews actually lived during the taxable years in issue, particularly when they were not at school, however, we cannot and will not find that they lived with petitioner for more than one-half of any of those years.

[9] In addition to deciding whether petitioner is entitled to certain deductions, we must also decide whether he is liable for section 6663 fraud penalties. And as we discuss further *infra* Opinion Part II.C.2, a relevant factor in determining whether petitioner is liable for the penalties is whether he has provided implausible or inconsistent explanations of behavior. In consideration of this factor, in our analysis of

**[\*21]**     2.     *Property Tax Deduction*

Petitioner claimed a $4,630 personal property tax deduction on his 2016 tax return. Section 164 allows itemized deductions for state and local personal property taxes and for state and local real property taxes paid during the taxable year. For this purpose, the term "personal property tax" means an ad valorem tax imposed on an annual basis in respect of personal property, and the term "real property tax" means tax imposed on interests in real property and levied for the general public welfare. § 164(b)(1); Treas. Reg. § 1.164-3(b).

Respondent contends that petitioner is not entitled to a deduction for personal property taxes because petitioner has not provided any substantiation for any such expenses. Respondent further contends that to the extent petitioner intended to claim a deduction for real property taxes paid with respect to the Antanna Avenue residence, rather than for personal property taxes, such a deduction should also be disallowed. In this regard respondent asserts that the deduction should be disallowed because the only receipt petitioner provided in support of the payment of real property taxes was dated 2017, and thus it did not establish that petitioner paid any such taxes during the year for which the deduction was claimed. In addition, respondent asserts that even if petitioner did pay real property taxes with respect to the Antanna Avenue residence in 2016, he still could not deduct them because he did not own the residence. Here again, we agree with respondent on all counts.

Petitioner has not provided any credible evidence, or even alleged, to the Court that he paid any personal property taxes during 2016. The record is similarly lacking in evidence that petitioner paid any real property taxes with respect to the Antanna Avenue residence during 2016. Petitioner, as a cash basis taxpayer, must recognize income for the year in which he "actually or constructively" receives it and take an allowable deduction into account for the taxable year in which the underlying expense was paid. §§ 451, 461; Treas. Reg. §§ 1.451-1(a), 1.461-1(a)(1). As respondent indicates, the only documentary evidence

---

the disputed deductions, including the dependency exemption deductions here, we have thus highlighted where petitioner has given implausible explanations to either RA Cascante or the Court as well as where the explanations he gave to RA Cascante were inconsistent with those he gave to the Court. We note, however, that our redetermination of petitioner's tax liabilities is based on the merits of the case he presented to the Court and not on any previous record developed at the administrative level. *See Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 328 (1974).

[*22] petitioner has provided at any point in support of a real property tax deduction is the receipt from the City of Baltimore dated 2017, which he provided to RA Cascante. But this receipt, which petitioner did not introduce into evidence, and petitioner's otherwise unsupported testimony are simply not enough to persuade us petitioner paid any real property taxes during 2016 with respect to the Antanna Avenue residence.

Furthermore, even if we were to assume petitioner did pay real property taxes with respect to the Antanna Avenue residence in 2016, we must also agree with respondent that petitioner still would not be entitled to a deduction under section 164 because it was not petitioner, but his brother, who owned the property. Generally, taxes are deductible only by the person upon whom they are imposed. Treas. Reg. § 1.164-1(a). We have held that taxpayers who do not hold legal title to property but establish they are equitable owners of the property are entitled to deduct property tax they paid for the property. *See Aulisio v. Commissioner*, T.C. Memo. 2024-29, at *38 (citing *Steinert v. Commissioner*, 33 T.C. 447, 449 (1959)). But petitioner has also failed to allege or produce any credible evidence that any real property taxes he did ostensibly pay were paid as the equitable owner of the Antanna Avenue residence. We therefore also disallow petitioner's claimed property tax deduction.

### 3. *Unreimbursed Employee Expense Deductions*

For taxable years 2015 and 2016, petitioner claimed itemized deductions with respect to unreimbursed employee expenses of $9,505 and $8,188, respectively. On his corresponding Form 2106 for 2015, petitioner included in his unreimbursed employee expense amount $8,221 of vehicle expenses and $1,284 of cell phone expenses. With respect to the vehicle expenses, petitioner reported that he drove 14,298 business miles, that his vehicle was used 98.39% for business, and that he had no other vehicle available for personal use. On his 2016 Form 2106, petitioner included in his unreimbursed expense amount $5,068 of vehicle expenses and $3,120 of cell phone expenses. As to these vehicle expenses, petitioner reported that he drove 9,386 business miles, that his vehicle was used 98.159% for business, and that he again had no other vehicle available for personal use.

Pursuant to section 162(a), a taxpayer may deduct all the ordinary and necessary expenses paid during the taxable year in carrying on any trade or business. For the years in issue, a taxpayer may

**[\*23]** claim an unreimbursed employee business expense as a miscellaneous itemized deduction, subject to the 2% floor of section 67(a), under section 162(a). *See* § 67(b); *Lucas v. Commissioner*, 79 T.C. 1, 6–7 (1982). An employee is considered to be in the business of being an employee and may deduct expenses that are (1) nonreimbursable, (2) related to the employee's trade or business of rendering services to the employer, and (3) ordinary and necessary expenses of such a trade or business. *See Lucas*, 79 T.C. at 6–7; Treas. Reg. § 1.162-1(a).

An expense is ordinary if it is normal, usual, or customary within a particular trade, business, or industry or arises from a transaction of common or frequent occurrence in the type of business involved. *Deputy v. du Pont*, 308 U.S. 488, 495 (1940). An expense is necessary if it is appropriate and helpful for the development of the business. *Welch v. Helvering*, 290 U.S. at 113. Ordinary and necessary business expenses do not include nondeductible personal, living, or family expenses. Treas. Reg. § 1.162-17(a); *see* § 262(a). Whether an expenditure satisfies the requirements of section 162 is a question of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943).

Respondent contends that petitioner is not entitled to deduct the disputed vehicle and cell phone expenses both because they are not ordinary and necessary and because petitioner failed to substantiate them. Respondent further asserts that the expenses are unreasonable and implausible on their face. We agree with respondent here as well.

During the examination petitioner told RA Cascante that the disputed expenses were primarily related to his work at BDF and that he would use his personal vehicle to pick up parts and vehicles and to shuttle customers when the shuttle was not available. RA Cascante asked petitioner for documentation to support these expenses, but he did not provide any. Petitioner was also unable to explain to RA Cascante how he calculated his expenses.

RA Cascante attempted to verify petitioner's statements regarding the use of his personal vehicle at BDF. During one of his meetings with petitioner, RA Cascante asked petitioner to call his supervisor. The supervisor to which they spoke, Mr. Marshall, said BDF would never allow petitioner to drive his personal vehicle for company business. After the call, petitioner told RA Cascante that Mr. Marshall was not aware of an agreement petitioner had with a higher level of management at BDF authorizing him to use his personal vehicle. But when RA Cascante asked petitioner if he would be willing to drive to

[*24] BDF to clear up the issue, petitioner declined. And petitioner's other BDF manager, Mr. Moskunas, had no knowledge of petitioner's ever asking to use his personal vehicle for a work task. Nor did petitioner explain the business necessity of the cell phone use to RA Cascante or provide him with any supporting documentation with respect to the phone.

At trial petitioner testified that all of the unreimbursed employee business expenses that he claimed were related to his work at BDF. Petitioner also testified, however, that, in addition to BDF, the expenses were related to another "agency" at which he had worked. He then further testified that they were "mostly" related to using his personal vehicle to shuttle customers for BDF, but that he never picked up parts for BDF, and that some portion of the expenses was indirectly connected with GEI's shipping activity as well.

As to BDF, petitioner additionally testified both that he never received BDF's employee handbook, which set forth its policy discouraging employees from incurring personal expenses to complete work-related tasks, and that there "were times" when he did not have it. He also testified that Mr. Marshall gave him the authority to use his personal vehicle but admitted that Mr. Marshall did not give him specific permission to do so.

On this record we cannot allow petitioner the claimed deductions with respect to the reported vehicle and cell phone expenses. We agree with respondent that these expenses were neither ordinary nor necessary with respect to petitioner's employment with BDF. Rather than give petitioner permission to incur such expenses, we instead find BDF discouraged him, along with its other employees, from doing so. There is also no credible evidence that any of these expenses related to petitioner's employment with respect to another "agency" or GEI. For 2015, petitioner does seem to have also been employed by Anytime Labor, from which he received a Form W–2. But petitioner offered no explanation or documentation as to how any of the reported expenses would have related to that employer at all let alone as to how they would have been ordinary and necessary as to that employer. We are also unpersuaded by petitioner's unsupported assertion that some unidentified portion of the reported vehicle and cell phone expenses qualified as deductible employee expenses because they were indirectly connected with GEI's shipping activity.

**[\*25]** We further conclude that petitioner failed to sufficiently substantiate any of the reported expenses. As to the vehicle expenses, they are subject to the strict substantiation requirements of section 274(d). Thus petitioner must show the amount, time and place, business purpose, and business relationship to him of the person receiving the benefit for each expenditure by either adequate records or sufficient evidence corroborating his own statements. §§ 274(d)(4), 280F(d)(4). Petitioner testified that he kept a book of his mileage expenses but that it was destroyed in the alleged flood, and he failed to provide any other supporting evidence. This is clearly insufficient. And as to the cell phone expenses, although they do not require strict substantiation for the years in issue, petitioner's inconsistent and unsupported explanations for these expenses are insufficient as well.[10] (We are hardly surprised by the lack of evidence in support of the reported unreimbursed employee expenses, however. As respondent has observed, petitioner's contention that he paid $9,505 in such expenses for 2015 and $8,188 for 2016 is simply implausible given that his total reported Form W–2 wages for 2015 and 2016 were only $4,343 and $9,230, respectively.) We therefore conclude that petitioner is also not entitled to the claimed deductions for unreimbursed employee expenses.

### D. *GEI's Flowthrough Deductions*

Pursuant to section 1366(a), a shareholder of an S corporation generally must take into account his pro rata share of the S corporation's income, losses, deductions, and credits. The examination of GEI for taxable years 2015, 2016, and 2017 resulted in the disallowance of several of GEI's deductions, specifically, those claimed with respect to bad debts, rents, freights and purchases, travel and entertainment, nonemployee compensation, and commissions. These adjustments flowed through to petitioner's individual returns, resulting in increased income from GEI for each of the taxable years in issue. Where, as here, an NOD includes adjustments for S corporation items with other items unrelated to the S corporation, we have jurisdiction to determine the

---

[10] *See* Small Business Jobs Act of 2010, Pub. L. No. 111-240, § 2043, 124 Stat. 2504, 2560 (removing cell phones from the definition of section 280F(d)(4) listed property, and thus from the scope of section 274(d), for taxable years beginning after December 31, 2009). Even though petitioner is not required to meet the strict substantiation requirements of section 274(d), we note that he must still show that the cell phone was used for business rather than personal purposes and provide some credible evidence as to the extent of the business use, which he did not do. *See, e.g.*, *Parker v. Commissioner*, T.C. Memo. 2016-194, at \*15 n.5.

[*26] correctness of all the adjustments.[11] *See Johnson v. Commissioner*, 160 T.C. 18, 28 (2023); *Winter v. Commissioner*, 135 T.C. 238, 245–46 (2010).

As with the other deductions at issue, petitioner bears the burden of proving his entitlement to the flowthrough deductions claimed and of substantiating their amounts. *See* § 6001; Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 84; *Hradesky*, 65 T.C. at 89–90; *see also, e.g., Isaacs v. Commissioner*, T.C. Memo. 2015-121, at *25–57 (applying burden of proof to taxpayer in regard to whether the Commissioner properly disallowed flowthrough deductions for certain business expenses of taxpayer's wholly owned S corporation). As set forth *supra* Opinion Part I.C.3, a taxpayer may deduct business expenses paid during the taxable year pursuant to section 162(a). Deductible business expenses include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's business, except items which are used as the basis for a deduction or a credit under provisions of law other than section 162. Treas. Reg. § 1.162-1(a).

### 1. *Bad Debts*

GEI claimed bad debt deductions of $2,482, $3,863, and $5,172 for taxable years 2015, 2016, and 2017, respectively. Section 166(a) generally allows a taxpayer a deduction for "any debt which becomes worthless within the taxable year." To be entitled to a business bad debt deduction, taxpayers must prove (1) that a bona fide debt was created, (2) that the debt was created or acquired in proximate relation to a trade or business, and (3) that the debt became worthless in the year claimed. § 166(a)(1); *United States v. Generes*, 405 U.S. 93, 96 (1972); *Calumet Indus., Inc. v. Commissioner*, 95 T.C. 257, 284 (1990). A debt is bona fide if it arose "from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas. Reg. § 1.166-1(c).

Worthless debts arising from unpaid fees, wages, salaries, rents, and similar items of income, however, are not deductible as a bad debt unless the taxpayer has included the amount in income for the year for which the bad debt is deducted or for a prior taxable year. *See Gertz v. Commissioner*, 64 T.C. 598, 600 (1975); Treas. Reg. § 1.166-1(e). "It is

---

[11] As discussed *supra* Findings of Fact Part V.A, respondent also disallowed GEI's claimed fuel tax credits, but these were entity-level adjustments that did not flow through to petitioner's individual returns and for which GEI received a separate NOD. *See* § 1366(a), (f)(1). As such, they are not at issue in this case.

[*27] well settled that a taxpayer is not allowed to reduce ordinary income actually received by the amount of income he failed to receive." *Ratcliff v. Commissioner*, T.C. Memo. 1983-636, 47 T.C.M. (CCH) 86, 87 (quoting *Hendricks v. Commissioner*, 406 F.2d 269, 272 (5th Cir. 1969), *aff'g per curiam* T.C. Memo. 1967-140)).

During the examination, petitioner told RA Cascante that there were generally two scenarios in which he would claim bad debt deductions: (1) if someone wrote petitioner a bad check, he would deduct it as bad debt expense when it happened; and (2) if he purchased a vehicle for transport overseas and upon receipt and inspection of the vehicle the customer negotiated a lower payment amount than that originally agreed upon. Although he has generally asserted that he is entitled to all the deductions in issue, petitioner has not made any additional arguments regarding the bad debt deductions to the Court. And as with RA Cascante, petitioner has failed to provide the Court with any records to support the bad debt deductions claimed.

Respondent contends that petitioner is not entitled to the bad debt deductions because of his failure to establish that any debts were created obligating a debtor to pay a fixed or determinable sum of money or that any such debts became worthless during the years in issue, as well as because of general lack of substantiation. To the extent any alleged bad debts relate to unpaid fees, he further contends that petitioner failed to establish that GEI included any corresponding amounts in income.

In the first instance, we agree with respondent that petitioner has provided no credible evidence demonstrating that any debts were created obligating debtors to pay fixed or determinable sums of money to GEI or that any such debts became worthless during the years in issue. In addition, even if we assume GEI did have worthless debts, we also agree that petitioner has failed to provide any credible evidence of the amounts of any such debts.

Moreover, as respondent aptly observes, it is "conspicuous" that GEI is a cash basis taxpayer and the bad debt examples given by petitioner to RA Cascante relate to unpaid fees. As we have explained, the unpaid fees would need to have been previously reported in income for the debt to be deductible. *See* Treas. Reg. § 1.166-1(e). As a cash basis taxpayer, however, GEI would not have included the fees in income before they were actually or constructively received. *See* §§ 451, 461; Treas. Reg. §§ 1.451-1(a), 1.461-1(a)(1); *see also Crosson v.*

[*28] *Commissioner*, T.C. Memo. 2003-170, 85 T.C.M. (CCH) 1475, 1477 ("[The taxpayers] used the cash method for reporting income and deductions; therefore, fees for services that remain unpaid have not been included in income. Such debts do not constitute 'bad debts' within the meaning of section 166 for which a deduction for worthlessness may be claimed.").

Petitioner testified at trial that he did sometimes report GEI's income on its books before it was received. But he provided no evidence in support of this testimony, which runs counter to both his stipulation that GEI used the cash basis method of accounting for the taxable years in issue and to his reporting on GEI's returns that GEI used the cash method. The Court treats a stipulation as a binding admission, and it will not permit a party to a stipulation to qualify, change, or contradict the stipulation in whole or in part, "except that it may do so if justice requires." Rule 91(e). Similarly, "[s]tatements made on a tax return signed by the taxpayer are considered binding admissions unless there is 'cogent evidence' that indicates such statements are wrong." *Kornhauser v. Commissioner*, T.C. Memo. 2013-230, at *5, *aff'd*, 632 F. App'x 421 (9th Cir. 2016). We do not consider petitioner's self-serving and unsupported testimony sufficient to require the Court to treat GEI's alleged unpaid fees as having been previously included in GEI's income, and we hold that the worthless debt deductions GEI claimed for the years in issue are disallowed.

2.    *Rents*

GEI claimed a $9,000 rent deduction for each of the years in issue. Petitioner used the basement of the three-story Antanna Avenue residence exclusively as GEI's office. The Antanna Avenue residence was owned by petitioner's brother, Mr. Oparanma. Petitioner had a verbal agreement with his brother to use the residence. During the examination, petitioner informed RA Cascante that the deductions reflected $750 per month in rent that he paid to Mr. Oparanma for GEI's use of the basement. But petitioner provided RA Cascante with no evidence that he was making rental payments to Mr. Oparanma.

RA Cascante did, however, view the 2017 City of Baltimore receipt as proof that petitioner had made a payment in lieu of rent for that year. RA Cascante therefore allowed one-third of the amount of the receipt, or $1,156, as a rent expense for 2017, as is reflected in

[*29] petitioner's NOD.[12] Respondent contends that other than this receipt, petitioner provided no substantiation that GEI paid rent in taxable years 2015, 2016, and 2017, and, therefore, GEI is not entitled to deduct any additional rent expense for these years. Again, we must agree.

At trial, petitioner testified that his verbal agreement with Mr. Oparanma required the reported $9,000 in yearly rental payments for GEI's use of the basement. He also testified that he would pay expenses and deposit money into "funds" for his brother in lieu of paying rent. But petitioner did not provide the Court with any support for this testimony. And just as his unsupported and self-serving testimony has been insufficient to persuade us as to the disputed deductions thus far, it is insufficient here.

### 3. *Freights and Purchases*

GEI claimed deductions for freight and purchase expenses of $79,856, $82,176, and $48,931 for taxable years 2015, 2016, and 2017, respectively. In discussing the freight and purchase expenses during the examination, petitioner provided RA Cascante with a buyer's order for a Jaguar that was purchased for $78,037 in 2015 as well as documents showing a Mack truck and a car were shipped from Boston to Nigeria for $2,930 in 2017. RA Cascante allowed the documented expenses, as is reflected in petitioner's NOD.

Respondent contends that petitioner is not entitled to deduct any additional amounts because he did not provide any additional credible evidence as to the reported freight and purchase expenses either during his examination or at trial. We agree here too and hold that GEI is not entitled to deductions for freight and purchase expenses beyond those already allowed.

### 4. *Travel and Entertainment*

GEI claimed deductions for reported travel and entertainment expenses of $6,734 and $7,426 for taxable years 2016 and 2017, respectively. Petitioner did not provide RA Cascante with any information regarding these expenses during the examination. At trial, petitioner testified he went to Nigeria on several occasions and other locations such as Houston, Boston, Miami, New York, and Pennsylvania

---

[12] As previously explained, RA Cascante arrived at the one-third amount by counting the basement as one-third of the residence.

**[*30]** to check out shipments for GEI. But petitioner did not identify any specific details regarding the travel or provide any documents in support of his testimony.

Travel and entertainment expenses for the years in issue are subject to the strict substantiation requirements of section 274(d). *See* § 274(d)(1) and (2). Respondent contends that petitioner has failed to meet these requirements, and we agree here as well. Petitioner's vague and unsupported testimony regarding his alleged trips do not sufficiently substantiate their amount, time and place, business purpose, and business relationship to petitioner of the person receiving the benefit for each expenditure by adequate records or sufficient evidence corroborating his own statements. The deductions for these expenses are therefore also disallowed.

### 5. *Nonemployee Compensation*

GEI claimed a deduction for a $14,250 nonemployee compensation expense on its return for taxable year 2015. During the examination, petitioner had no records to support the expense, and he was unable to reconstruct the amount reported, which he asserted had been paid in cash. Petitioner explained to Mr. Cascante that GEI was not required to issue Forms 1099 with respect to the nonemployee compensation because no individual worker was paid over $600. *See* § 6041(a). But petitioner could not name any of the workers paid, nor did he know whether the same person worked for him multiple times.

At trial petitioner testified that the amount of nonemployee compensation he reported on GEI's return was based on amounts given to him by Mr. Apusa with respect to shipment issues he handled in Boston. He also testified that Mr. Apusa did not tell petitioner how much each person got paid but provided only a total amount it would allegedly cost to do a job and that it was Mr. Apusa who directly paid the workers rather than himself. Petitioner could not estimate the number of people paid nonemployee compensation or the amount each person was paid.

As with the other GEI expenses in dispute, respondent contends that petitioner has failed to provide substantiation sufficient to show GEI is entitled to the claimed deduction, with petitioner appearing to know very little about the amount or purpose of the alleged nonemployee compensation expenses or about whether nonemployee compensation payments were even made at all. We again agree and conclude that petitioner has failed to sufficiently substantiate a nonemployee

**[\*31]** compensation deduction for the amount claimed. Although we have found GEI did sometimes pay day laborers to help load containers in the United States and to help unload containers abroad, we similarly conclude that petitioner has failed to provide enough evidence for us to estimate an amount and that to do so would amount to unguided largesse. *See Williams*, 245 F.2d at 560.

### 6. *Commissions*

GEI claimed a deduction for a $7,520 commission expense on its return for taxable year 2017. Petitioner told RA Cascante during his examination that the purpose of the commission expense was to pay a transfer agent in Nigeria. Petitioner did not provide RA Cascante with any records to support the expense.

At trial petitioner testified that the commission expense was for payments made to workers in Nigeria to move goods from the dock to the client and that he paid such workers by sending money to his cousin Santi Oksuha, who then paid the workers. Petitioner also testified that he paid commissions to day workers in Boston to load trucks.

Respondent contends that petitioner has failed to sufficiently substantiate this deduction as well, emphasizing that petitioner provided no documentation to support that any commission payments were made to Mr. Oksuha, that Mr. Oksuha made any commission payments to Nigerian agents, or that GEI incurred the commission expenses at all. And as with the nonemployee compensation expense, he further emphasizes that petitioner provided no credible evidence regarding the amounts of any commission payments, the frequency of the payments, or the number of people paid. We here again agree that petitioner has failed to sufficiently substantiate a deduction in the amount claimed or in any other amount and disallow this deduction as well.[13]

---

[13] Respondent also points out that there appears to have been some overlap in petitioner's testimony regarding what he characterized as nonemployee compensation expenses and what he categorized as commission expenses. We agree, particularly with respect to the Boston workers, who petitioner's testimony suggested were paid nonemployee compensation by Mr. Apusa but commissions by himself. We note that petitioner's conflation of these asserted expenses further bolsters our reluctance to estimate either.

**[\*32]** E.     *Conclusion*

Having held that petitioner is not entitled to any of the disputed deductions, we sustain respondent's determinations disallowing the deductions.

II.     *Fraud Penalties*

We next consider respondent's section 6663 fraud penalty determinations.

A.     *Burdens of Production and Proof*

Section 6663(a) provides that "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." Where the Commissioner seeks to apply this penalty to an individual, as a threshold matter he must produce evidence that he complied with section 6751(b)(1). *See* § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Section 6751(b)(1) requires that the "initial determination" of assessment of certain penalties, including the section 6663 fraud penalty, be "personally approved (in writing) by the immediate supervisor of the individual making such determination."

The Commissioner must also prove by clear and convincing evidence that "an underpayment exists for the years in issue and that some portion of the underpayment is due to fraud." *Petzoldt v. Commissioner*, 92 T.C. 661, 699 (1989); *see* § 7454(a); Rule 142(b). The Commissioner need not prove the precise amount of the underpayment resulting from fraud, however, only that some part of the underpayment of tax for each year in issue is attributable to fraud. *Petzoldt*, 92 T.C. at 699. If the Commissioner establishes that any portion of an underpayment is attributable to fraud, then the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes by a preponderance of the evidence is not attributable to fraud. § 6663(b).

B.     *Penalty Approval*

As stated, section 6751(b)(1) requires that the "initial determination" of assessment of a section 6663 fraud penalty be "personally approved (in writing) by the immediate supervisor of the

**[\*33]** individual making such determination." In *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020), we explained that the "initial determination" of a penalty assessment is typically embodied in a document "by which the IRS formally notifie[s] [the taxpayer] that the Examination Division ha[s] completed its work and . . . ha[s] made a definite decision to assert penalties." Once the Commissioner introduces evidence sufficient to show written supervisory approval of that determination, the burden shifts to the taxpayer to show that the approval was untimely, i.e., "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was secured. *Frost v. Commissioner*, 154 T.C. 23, 35 (2020).[14]

Respondent contends that he obtained proper, written supervisory approval of the section 6663 fraud penalties for the years in issue. In support of this contention, he asserts that RA Cascante obtained timely approval of the penalty when Ms. Gunn, as RA Cascante's only supervisor involved in petitioner's case, signed both the 30-day letter and the Civil Penalty Approval Form on April 26, 2019, which was the first time the penalties were communicated to petitioner.

We agree that Ms. Gunn was the appropriate supervisor to provide approval. Although RA Cascante was transferred to a new position with a new supervisor during his work on petitioner's case, Ms. Gunn remained the supervisor responsible for petitioner's case and the only supervisor to whom RA Cascante reported with respect to it. *See Sand Inv. Co. v. Commissioner*, 157 T.C. 136, 142–43 (2021). We also agree that Ms. Gunn's approval was timely. Both the 30-day letter and the Civil Penalty Approval Form appear in the record. Respondent first notified petitioner of the determination to impose the section 6663 fraud penalties in the 30-day letter, which was issued on April 26, 2019. And on that date, Ms. Gunn signed both the 30-day letter itself, which clearly

---

[14] Absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Fourth Circuit. *See* § 7482(b)(1)(A). Unlike certain other appellate courts, that court has not squarely addressed the question of when supervisory approval must be secured for purposes of section 6751(b)(1). *Cf. Swift v. Commissioner*, 144 F.4th 756, 770 (5th Cir. 2025), *aff'g* T.C. Memo. 2024-13; *Minemyer v. Commissioner*, No. 21-9006, et al., 2023 WL 314832, at \*5 (10th Cir. Jan. 19, 2023), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2020-99; *Kroner v. Commissioner*, 48 F.4th 1272, 1276, 1279 n.1 (11th Cir. 2022), *rev'g in part* T.C. Memo. 2020-73; *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020). We therefore apply our own precedent on the issue. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971); *Lawrence v. Commissioner*, 27 T.C. 713, 716–17 (1957), *rev'd per curiam on other grounds*, 258 F.2d 562 (9th Cir. 1958).

**[\*34]** asserted the section 6663 fraud penalties, and the Civil Penalty Approval Form, which, although imperfect, the parties stipulated approved the assertion of the section 6663 penalties for the years in issue. *See, e.g., Frost*, 154 T.C. at 35; *Soleimani v. Commissioner*, T.C. Memo. 2023-60, at \*9–11; *Cuthbertson v. Commissioner*, T.C. Memo. 2020-9, at \*70.

Petitioner has neither made any argument nor provided any evidence that the penalties were not approved by RA Cascante's immediate supervisor or that the approval was untimely. He argues instead that "I do not think it was fair for [Ms.] Gunn to have formed [her] opinion of me based on the frivolous characterization of me by [RA] Cascante without speaking with me or appearing during the trial to allow me the opportunity for questioning the charges that she signed on to." But the written supervisory approval requirement of section 6751(b)(1) "requires just that: written supervisory approval." *Belair Woods, LLC*, 154 T.C. at 17 (quoting *Raifman v. Commissioner*, T.C. Memo. 2018-101, at \*61). And "'[w]e decline to read into section 6751(b)(1) the subtextual requirement' that respondent demonstrate the depth or comprehensiveness of the supervisor's review." *Id.* (quoting *Raifman*, T.C. Memo. 2018-101, at \*61). In this case the 30-day letter and the Civil Penalty Approval Form were signed in timely fashion by Ms. Gunn, RA Cascante's immediate supervisor with respect to petitioner's case, and we conclude that respondent has complied with section 6751(b)(1).

### C.   *Underpayments Due to Fraud*

To satisfy his burden of proof regarding the 6663 fraud penalties, respondent must show two things for each of the years in issue. First, respondent must prove that an underpayment exists. *See Parks v. Commissioner*, 94 T.C. 654, 660 (1990). And second, he must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. *See id.* at 661.

### 1.   *Underpayment of Tax*

The first prong of the fraud test requires that respondent affirmatively prove that petitioner underpaid his tax for each of the years in issue. *See id.* at 660. Where the Commissioner has prevailed on the issue of the existence of a deficiency by virtue of a taxpayer's failure to carry his burden of proof, he cannot rely on that failure to sustain his

[*35] burden. *Id.* at 660–61. In this case petitioner failed to meet his burden of proof as to the deficiency determinations. As demonstrated by our analysis of the disputed deductions *supra* Opinion Part I.C. and D, however, wholly independent of petitioner's failure to meet his burden of proof, there is also clear and convincing evidence in the record that petitioner claimed deductions to which he was not entitled and which resulted in an underpayment of tax for each year. Therefore, respondent has satisfied his burden of proof on this issue. *See Jordan v. Commissioner*, T.C. Memo. 1986-389, 52 T.C.M. (CCH) 234, 237.

### 2.     *Fraudulent Intent*

Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. *DiLeo v. Commissioner*, 96 T.C. 858, 889 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Petzoldt*, 92 T.C. at 699. Because direct evidence of fraud is rarely available, fraud may be proved by circumstantial evidence and reasonable inferences from the facts. *Id.*

Courts have developed a nonexclusive list of factors, or "badges of fraud," that demonstrate fraudulent intent. *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). These badges of fraud include: (1) understating income (including by overstating deductions); (2) keeping inadequate records; (3) giving implausible or inconsistent explanations of behavior; (4) failing to cooperate with tax authorities; (5) filing false documents (including false tax returns); (6) dealing in cash; (7) engaging in a pattern of behavior that indicates an intent to mislead; and (8) providing testimony that lacks credibility. *See Spies v. United States*, 317 U.S. 492, 499 (1943); *Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *Gould v. Commissioner*, 139 T.C. 418, 446 (2012), *aff'd*, 552 F. App'x 250 (4th Cir. 2014); *Niedringhaus*, 99 T.C. at 211; *Drobny v. Commissioner*, 86 T.C. 1326, 1349 (1986). Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. *Petzoldt*, 92 T.C. at 700. The taxpayer's intelligence, education, and tax expertise are also relevant in determining fraudulent intent. *Gould*, 139 T.C. at 446.

In support of his contention that the section 6663 fraud penalties should apply, respondent asserts that petitioner's sophistication, in conjunction with his substantial understatements of income tax due to overstated expenses, lack of records, failure to cooperate with RA

**[\*36]** Cascante, dealings in cash, and continuous inconsistent statements, demonstrate petitioner's fraudulent intent.[15] We agree that there is considerable evidence to show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. *See Parks*, 94 T.C. at 661.

Petitioner is a well-educated businessman and an experienced tax return preparer, and yet he significantly overstated the deductions to which he was entitled on his and GEI's returns for each of the years in issue. During the examination, he required RA Cascante to summon his bank records, failed to provide promised documents and meetings, and ultimately provided RA Cascante with only minimal documentation to support the claimed deductions. And during trial petitioner provided the Court with no documentation or other corroborating evidence at all with respect to his testimony.

Petitioner also made implausible and inconsistent statements throughout the course of the examination and trial, as repeatedly demonstrated throughout our analysis of the disputed deductions *supra* Opinion Part I.C. and D, including statements surrounding his employee business expenses that were refuted. And we have found incredible his assertions that whatever books and records he did maintain were destroyed in a flood or absconded with by RA Cascante. We also note that petitioner caused GEI to operate primarily in cash and that GEI did not deposit all its gross receipts into, and paid few expenses from, its bank accounts.

In light of the foregoing, respondent has clearly and convincingly established that at least some portion of the underpayment for each year in issue is attributable to fraud. Petitioner asserts that he did not "knowingly or intentionally . . . defraud anyone or the government." Particularly given petitioner's education and experience, however, this assertion also seems to us incredible. We conclude therefore that the entire underpayment for each year must be treated as attributable to fraud. *See* § 6663(b). Consequently, we hold that petitioner is liable for the section 6663 fraud penalties determined by respondent.

---

[15] Respondent asserts that petitioner's claiming of GEI's disallowed fuel tax credits is also indicative of fraud. As we have noted, however, the fuel tax credits are not at issue in this case. And regardless of whether they were properly claimed, we find more than sufficient evidence in the record to clearly and convincingly support the existence of fraud. We thus consider the fuel tax credits no further.

**[*37]** III.    *Conclusion*

We have held that petitioner is liable for the deficiency and section 6663 fraud penalty determined by respondent for each of the years in issue. We have considered all arguments made and facts presented in reaching our holdings, and to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*